**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas C. LEAHY, Defendant–Appellant.**

No. 98–1176.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1998.

Decided Feb. 17, 1999.

John W. Vaudreuil (argued), Peggy A. Lautenschlager, Office of United States Attorney, Madison, WI, for Plaintiff–Appellee.

David L. Mandell, Rick B. Meier (argued), Mandell, Ginsberg & Meier, Madison, WI, for Defendant–Appellant.

Before COFFEY, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Thomas Leahy pleaded guilty to possession of a toxin for use as a weapon in violation of 18 U.S.C. § 175(a) and was sentenced pursuant to the 1997 version of the United States Sentencing Guidelines Manual ("Sentencing Guidelines" or "U.S.S.G."). As part of a negotiated plea agreement with Leahy, the government agreed to recommend to the district court that U.S.S.G. § 2K2.1, which covers the "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition," was the most "analogous" offense guideline because no guideline had been promulgated by the United States Sentencing Commission to cover violations of section 175(a) at the time of Leahy's sentencing. The district court accepted the government's recommendation. Although application U.S.S.G. § 2K2.1 called for a guideline range of forty-one to fifty-one months, the district court determined that an upward departure was warranted because U.S.S.G. § 2K2.1 did not adequately capture the seriousness of Leahy's offense. The district court then departed upward ten levels from the base offense level that otherwise would have been applicable to Leahy's offense under U.S.S.G. § 2K2.1 and sentenced Leahy to 151 months in prison. Leahy now appeals this sentence.

Leahy's appeal raises difficult questions regarding the appropriateness and reasonableness of an upward departure in a case in which a district court applies an "analogous" guideline to an offense for which there is no directly applicable guideline. Leahy raises two issues in connection with his appeal: (1) whether it was appropriate for the district court to depart upward in this case; and (2) whether the extent of the resulting departure was reasonable. Because we agree with Leahy that the ten level upward departure was unreasonable in extent, we vacate Leahy's sentence and remand for resentencing.

## I. History

### A. Facts

On November 23, 1996, Thomas Leahy shot his step-son in the face with a handgun. Soon thereafter, local authorities arrested Leahy and the State of Wisconsin subse-quently charged him with negligent use of a weapon and felon in possession of a weapon. During the course of the ensuing police investigation into the shooting, members of Leahy's family came forward and alerted both local and federal authorities of Leahy's possession and experimentation with dangerous chemical and biochemical materials.

Leahy's wife was the first to contact the authorities. She informed the investigating officers that Leahy possessed books and manuals regarding the making of poisons and had petri dishes in which she believed he was developing deadly concoctions. On several occasions, Leahy's wife provided authorities with items allegedly belonging to Leahy including: various insecticides, numerous unknown chemicals and materials, bags of castor beans, a spray bottle containing an unidentified liquid, gas masks and protective gear, assorted laboratory equipment, and several books and other scientific materials on the making of poisons and toxins.

When he was well enough, Leahy's step-son also made several reports to the authorities regarding his step-father's activities. Specifically, he told authorities that during the summer of 1996, Leahy showed him chemicals, poisons, and other similar materials he stored in a storage shed in Harvey, Illinois. He also reported that, on occasion, Leahy wore a gas mask and a white plastic gown around their home and that Leahy had shown him a large quantity of chemicals and biochemical materials he kept in the family's garage.

Members of Leahy's family also reported to local and federal authorities that Leahy had threatened to use the "poisons" he developed on several occasions. Leahy's wife stated that he told her two weeks before the shooting incident that he was going to poison his mother and murder his ex-wife. Leahy's step-son informed authorities that Leahy claimed to have used poisons in the past. Leahy's sister told authorities that Leahy often spoke of killing people, usually family and friends. On one occasion, Leahy told her that he was developing an airborne-type bacteria that could be delivered through the mail and used to kill his enemies. Leahy stated that he would put his "killer virus" on

the edge of razor blades and affix the blades to envelopes to be mailed to his enemies. Leahy hoped his enemies would become infected by cutting their fingers when opening the envelopes.

Ultimately, authorities recovered two illegal substances from Leahy's home: ricin and a spray bottle containing a mixture of nicotine sulfate and dimelthyly sulfoxide ("DMSO"). Ricin is a toxin derived from the castor bean plant and is considered to be the second most deadly toxin known to man; a toxin for which there is no known antidote. When inhaled or ingested, in even a tiny amount, ricin dust is typically fatal. Equally as disconcerting, ricin is virtually impossible to trace as a cause of death. According to authorities, the amount (.67 grams) and purity (4.1 percent) of the ricin in Leahy's possession was enough to kill approximately 125 people.

Nicotine sulfate reportedly is marketed by chemical suppliers for use in a variety of insect poisons. If injected under the skin, a very small amount of nicotine sulfate can have a deadly effect. DMSO, a legal substance, has the ability to penetrate the skin on contact and enter the bloodstream. Applying DMSO contaminated with a toxin such as ricin or nicotine sulfate to a person's skin would have an effect similar to that of injecting the toxin directly with a syringe. According to authorities, given the amount and purity of nicotine sulfate/DMSO mixture in the spray bottle recovered from Leahy's home, as little as three sprays of this mixture could be lethal.

## B.  District Court Proceedings

A federal grand jury returned a one-count indictment charging Leahy with knowingly possessing a toxin, specifically, ricin, for use as a weapon in violation of 18 U.S.C. § 175(a).[1]  In a superseding indictment, two new counts were added to the earlier indictment.  Count 2 charged Leahy with knowingly possessing a toxin, specifically, nicotine sulfate, for use as a weapon.  Count 3 charged Leahy with possessing a delivery system designed to deliver or disseminate a toxin for use as a weapon.  All three counts of the superseding indictment charged offenses in violation of 18 U.S.C. § 175(a).

As part of a plea agreement, Leahy agreed to plead guilty to Count 1 of the superseding indictment, and the government agreed to dismiss the remaining charges.  The government also agreed to inform both the district court and the probation office that U.S.S.G. § 2K2.1 was the most "analogous" offense guideline because no guideline had been promulgated for violations of 18 U.S.C. § 175(a).[2]  The government considered U.S.S.G. § 2K2.1, which addresses the unlawful receipt, possession, or transportation of firearms, the most "analogous" guideline because the term "firearm" is defined to include a "destructive device," see 28 U.S.C. § 5845(a), and the term "destructive device" is then defined to include poison gas devices, 26 U.S.C. § 5845(f).[3]  Reasoning that "ricin is poisonous," the government recommended that the district court utilize U.S.S.G. § 2K2.1 in sentencing Leahy.

The probation office's presentence report ("PSR") similarly noted that no specific guideline had been expressly promulgated to cover violations of 18 U.S.C. § 175(a).  However, the PSR reached a conclusion contrary to the government's recommendation that U.S.S.G. § 2K2.1 was the most "analogous"

---

1.  Section 175(a) provides:
    Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any terms of years, or both. 18 U.S.C. § 175(a).

2.  In cases such as this, "for which no guideline expressly has been promulgated," the Sentencing Guidelines direct the courts to "apply the most

analogous offense guideline," assuming that a "sufficiently analogous" guideline exists.  See U.S.S.G. § 2X5.1.

3.  A "Destructive device" is a type of firearm listed in 26 U.S.C. § 5845(a) and is defined to mean: "(1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device...." 26 U.S.C. § 5845(f);  see also U.S.S.G. § 2K2.1 n. 4 (quoting same language).

guideline to Leahy's offense. The PSR concluded that there was no "analogous" guideline for Leahy's offense because ricin is a toxin, not a destructive device or a poison gas. Therefore, the district court could impose a sentence up to and including life in prison—the maximum statutory penalty for possession of a toxin under 18 U.S.C. § 175(a).[4]

Notwithstanding its conclusion regarding the applicability of U.S.S.G. § 2K2.1 to this case, the PSR calculated the guideline range to be applied under U.S.S.G. § 2K2.1 in the event the district court elected to accept the government's recommendation. The PSR determined Leahy's initial base offense level to be twenty pursuant to U.S.S.G. § 2K2.1(a)(4)(B). After subtracting three levels for acceptance of responsibility and adding a four level enhancement under U.S.S.G. § 2K2.1(b)(5) for intent to use ricin as a weapon, the PSR calculated Leahy's total base offense level as twenty-one. With a criminal history category of II, the PSR determined the Guideline's imprisonment range to be forty-one to fifty-one months for Leahy's offense. However, the PSR recommended that the district court "depart upward significantly" if the court elected to

apply U.S.S.G. § 2K2.1 because the application of U.S.S.G. § 2K2.1 did not "come close to capturing the seriousness of the offense" in this case.

At the sentencing hearing, the district court also recognized that there was no specific guideline applicable to violations of 18 U.S.C. § 175(a). Contrary to the recommendation contained in the PSR, however, the district court concluded that the application of U.S.S.G. § 2K2.1 by analogy was appropriate in this case. In support of its conclusion that U.S.S.G. § 2K2.1 was "sufficiently analogous," the district court noted "that although ricin is a toxin as is set forth in the charge, nonetheless it has been used in the vernacular as being a poison and [is] commonly referred to as a poison in the less than legal jargon we are familiar with." The district court further reasoned that even though ricin is technically a toxin, not a poison, it is "perhaps more closely analogous to a poison gas than any other of the guidelines which can be found and examined." Therefore, the district court adopted the reasoning suggested by the government in the plea agreement and found that ricin was sufficiently analogous to poison gas devices to warrant application of U.S.S.G. § 2K2.1.[5] Having selected

---

4. In the absence of a "sufficiently analogous" guideline, the Sentencing Guidelines direct the district courts to fashion an "appropriate sentence" in accordance with the general provisions of 18 U.S.C. § 3553(b). *See* U.S.S.G. § 2X5.1 ("If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) shall control . . .").

Section 3553(b) provides, in relevant part, that:

> [i]n the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

18 U.S.C. § 3553(b). Subsection (a)(2) requires the sentencing court to consider:

> the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes

of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

5. In adopting the recommendation set forth in the plea agreement, the district court also looked to *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996)—the only other court to address the possession of ricin under the Sentencing Guidelines—for guidance. In *Baker*, a jury found the defendants guilty of aiding and abetting one another in knowingly possessing a toxin, ricin, for use as a weapon in violation of 18 U.S.C. § 175. *Id.* at 335. Specifically, the defendants were found guilty of possessing about .7 grams of five percent pure ricin. *Id.* at 333.

The district court in *Baker*, presumably relying on U.S.S.G. § 2K2.1, sentenced each defendant to thirty-three months imprisonment. *Id.* at 335. We say "presumably" because it appears the underlying district court opinion is unpublished and the Eighth Circuit's opinion does not address any sentencing issues under the Sentencing Guidelines because the defendants did not challenge their sentences on appeal. However, a sentence of thirty-three months under the facts of

U.S.S.G. § 2K2.1 as the most "analogous" guideline, the district court then found the probation office's initial calculation of the applicable guideline range of forty-one to fifty-one months "to be the appropriate level in this matter for purposes of sentencing."

After reaching these initial conclusions, the district court then opted to depart upward significantly from the guideline range provided in U.S.S.G. § 2K2.1 because the aggravating circumstances existed in this case that were not adequately taken into account by the Sentencing Commission in formulating U.S.S.G. § 2K2.1. The district court determined that a significant upward departure was necessary in this case because U.S.S.G. § 2K2.1 depreciated the seriousness of Leahy's offense as it did not adequately address the possession of a toxin for use as a weapon. The district court found four specific aggravating circumstances warranted an upward departure in this case. These circumstances were: (1) the maximum penalty for possession of a toxin under 18 U.S.C. § 175(a) is life whereas the maximum penalty for possession of a destructive device under 26 U.S.C. § 5861 is only ten years; (2) the number of toxins possessed by Leahy (two); (3) the high toxicity of ricin, nicotine sulfate, and the mixture of nicotine sulfate and DMSO; and (4) the potential for mass homicides the toxins afforded.

Based on these aggravating factors, the district court increased Leahy's offense level by ten levels. To justify the extent of this departure, the district court first turned to 18 U.S.C. § 2332a, which penalizes the use of "weapons of mass destruction," for guidance. This section provides, in relevant part, that:

A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction, including any biological agent, toxin, or vector (as those terms are defined in section 178) ... shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or for life.

18 U.S.C. § 2332a(a). The term "weapon of mass destruction" is defined, in part, as "any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors." 18 U.S.C. § 2332a(c). Although Leahy was never charged under 18 U.S.C. § 2332a, the district court believed this section provided a better gauge for the proper sentence in this case as it is the section most related to the death that could have occurred if Leahy had been allowed to pursue his endeavors unchecked. However, the district court, having arrived at its conclusion that ricin is a potential "weapon of mass destruction," did not link the extent of the upward departure in this case to those guidelines specified as relating to the conduct prohibited by 18 U.S.C. § 2332a.[6] Instead, the court relied upon U.S.S.G. § 3A1.4, the Terrorism guideline, to justify the extent of the upward departure.

U.S.S.G. § 3A1.4 calls for an upward adjustment of twelve levels and a Criminal History of VI "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." See U.S.S.G. § 3A1.4. A "[f]ederal crime of terrorism" is defined as an offense that is "calculated to

that case does suggest that the district court did rely upon U.S.S.G. § 2K2.1 in sentencing the defendants.

6. After identifying the relevant statute of conviction (or in this case, the most analogous statute related to the charged offense conduct), the district court should have turned, as the Sentencing Guidelines direct, to the Statutory Index (Appendix A of the Sentencing Guidelines) to assist it in determining the applicable offense guideline section. See U.S.S.G. § 1B1.1(a). The introduction to the Statutory Index explains that "[t]his index specifies the guideline section or sections ordinarily applicable to the statute of conviction." U.S.S.G. app. A, at 417 (introduction). For violations of 18 U.S.C. § 2332a, the Statutory Index refers us to U.S.S.G. §§ 2A1.1 (First Degree Murder), 2A1.2 (Second Degree Murder), 2A1.3 (Voluntary Manslaughter), 2A1.4 (Involuntary Manslaughter), 2A1.5 (Conspiracy or Solicitation to Commit Murder), 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder), 2A2.2 (Aggravated Assault), 2B1.3 (Property Damage or Destruction), and 2K1.4 (Arson; Property Damage by Use of Explosives). The district court did not look to any of these guidelines to justify the extent of the upward departure in this case. Instead, the district court looked to U.S.S.G. § 3A1.4, a guideline that provides for victim-related adjustments stemming from acts of terrorism.

influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of, among other provisions, 18 U.S.C. § 175 (relating to biological weapons). *See* 18 U.S.C. § 2332b(g)(5). However, because the district court recognized that Leahy did not engage in "an actual act or attempted act of terrorism," the court elected to depart upward only ten levels, rather than twelve, resulting in an adjusted base offense level of thirty-one. For this same reason, the district court also elected not to increase Leahy's Criminal History category. All told, the district court's upward adjustment resulted in a guideline range of 121 to 151 months. The district court then selected the maximum sentence within this range, a term of 151 months, to "reflect the seriousness of this offense, hold the defendant accountable for his conduct, promote general and specific deterrence, and protect the community from the defendant." Leahy now appeals the district court's upward departure in this case.

## II. ANALYSIS

A district court's decision to depart from the applicable sentencing guideline range is reviewed under an abuse of discretion standard. *See Koon v. United States,* 518 U.S. 81, 91, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Furkin,* 119 F.3d 1276, 1283 (7th Cir.1997); *United States v. Billingsley,* 115 F.3d 458, 466 (7th Cir. 1997). This Court employs a three-part approach in reviewing a district court's decision to depart upward from the applicable guideline range. *See United States v. Ross,* 77 F.3d 1525, 1551 (7th Cir.1996). First, we ask whether the grounds for the departure were appropriate. *Id.* Second, we must ensure that the district court's factual findings regarding the departure were not clearly erroneous. *Id.* Third, we consider whether the extent of the resulting upward departure was reasonable. *Id.*

On appeal, Leahy challenges the district court's decision to depart upward from the base offense level for his conduct as proscribed by U.S.S.G. § 2K2.1. Leahy first argues that the district court abused its discretion in departing upward from the guideline range of thirty-one to forty-one months provided by U.S.S.G. § 2K2.1. Having made the determination that U.S.S.G. § 2K2.1 was the most "analogous" guideline, Leahy contends that the district court should have sentenced him within that range. The primary thrust of Leahy's first challenge is that there were no grounds present in this case which took it outside of the "heartland" of cases covered by U.S.S.G. § 2K2.1. As a result, the district court's decision to depart upward was erroneous.

Leahy's second challenge is that the ten level upward departure was unreasonable. Leahy submits that even if the factors relied upon by the district court were adequate grounds for a departure in this case, the district court nevertheless abused its discretion by departing upward ten levels. Specifically, Leahy contends that the district court erred in relying upon 18 U.S.C. § 2332a and U.S.S.G. § 3A1.4 as providing a basis for departing upward ten levels given the uncontested facts in this case.

Because we agree with Leahy that the district court erred in looking to U.S.S.G. § 3A1.4 to determine the proper extent of the departure in this case, we will vacate Leahy's sentence and remand for resentencing.

### A. *The Grounds For Departure Were Appropriate*

At the outset, we note that a district court must ordinarily impose a sentence falling within the applicable guideline range. *See Koon,* 518 U.S. at 85, 116 S.Ct. 2035; *Furkin,* 119 F.3d at 1283. A district court may depart from the applicable guideline range and sentence a defendant outside that range only if "the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)); *see Koon,* 518 U.S. at 92, 116 S.Ct. 2035; *Furkin,* 119 F.3d at 1284; *Billingsley,* 115 F.3d at 466. In other words, "[i]n the absence of a characteristic or circumstance that distinguishes a case as suffi-

ciently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized." U.S.S.G. § 5K2.0, comment.

■ In examining a district court's ability to depart from the applicable guideline range in a particular case, the Supreme Court in *Koon* explained that the Sentencing Commission intended "the sentencing courts to treat each guideline as carving out a 'heartland', a set of typical cases embodying the conduct that each guideline describes." *Koon*, 518 U.S. at 93, 116 S.Ct. 2035 (quoting U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b)). That is, the Sentencing Commission "did not adequately take into account cases that are, for one reason or another, 'unusual.' " *Id.* Thus, "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b); *see also Koon*, 518 U.S. at 93, 116 S.Ct. 2035 (quoting same). Therefore, before a district court is permitted to depart in a given case, certain features of the case must be found "unusual" enough for it to fall outside the "heartland" of cases covered in the applicable guideline. *See Koon*, 518 U.S. at 93, 116 S.Ct. 2035 (reasoning that factors that make a case atypical provide potential bases for departure because atypical cases were not adequately taken into account by the Sentencing Guidelines).

### 1.

Before we turn to look at whether the specific factors cited by the district court in this case were appropriate grounds for an upward departure, we first pause to consider whether any violation of 18 U.S.C. § 175(a) can be said to fall within the "heartland" of cases under U.S.S.G. § 2K2.1. As we previously stated, it is Leahy's contention that the district court, having made the determination that U.S.S.G. § 2K2.1 was the appropriate guideline for this case, should have been compelled to sentence Leahy within the guideline range provided in U.S.S.G. § 2K2.1. Relying primarily on the analysis employed by the government in suggesting

that U.S.S.G. § 2K2.1 was the most "analogous" guideline to the charged offense conduct, Leahy argues that U.S.S.G. § 2K2.1 specifically contemplates the possession of ricin as being within its "heartland" of cases. That is, U.S.S.G. § 2K2.1 covers "destructive devices," which are defined to include poison gas devices, grenades, rockets, and missiles. Leahy argues that his conduct, the "mere" possession of .67 grams of ricin, cannot be said to significantly differ from the norm "where the norm includes possession of poison gas rockets and or bombs."

■ We disagree with Leahy's contention that U.S.S.G. § 2K2.1 specifically contemplates violations of 18 U.S.C. § 175(a). As the Supreme Court noted, under the Guidelines' "heartland" concept, the Sentencing Commission "formulated each guideline to apply to a heartland of typical cases." *Koon*, 518 U.S. at 94, 116 S.Ct. 2035. In other words, under the "heartland" concept, even when a guideline has been *expressly* promulgated to cover a certain criminal offense (*i.e.*, the statutory provision is either explicitly referenced in the commentary following U.S.S.G. § 2K2.1 or listed in the Statutory Index contained in Appendix A), the Sentencing Guidelines recognize that an "atypical" case may arise, when the guideline explicitly applies, but the conduct "significantly differs from the norm." *Id.* (citations omitted). As a result, most, but not all, of the conduct regulated by those statutory provisions explicitly referenced would be considered "typical" and within the "heartland" of cases covered by that guideline. By implication, cases embodying conduct regulated by statutory provisions that are not referenced by a particular guideline logically cannot be found to fall within the "heartland" of that particular guideline.

In formulating U.S.S.G. § 2K2.1, the Sentencing Commission was concerned primarily with offenses in violation of certain provisions of 18 U.S.C. § 922, 18 U.S.C. § 924, and 26 U.S.C. § 5861, which regulate firearms and destructive devices. This concern is evidenced by the fact that these statutory provisions are specifically referenced by U.S.S.G. § 2K2.1. *See* U.S.S.G. § 2K2.1, comment. (statutory provisions). By contrast, 18

U.S.C. § 175 is neither specifically referenced in the commentary following U.S.S.G. § 2K2.1, nor cross referenced to U.S.S.G. § 2K2.1 in the Statutory Index. This omission implies that the Sentencing Commission did not consider that conduct regulated by section 175 when it promulgated U.S.S.G. § 2K2.1. Therefore, we find it difficult to accept Leahy's argument that his conduct did not differ significantly from the norm under U.S.S.G. § 2K2.1 when the Sentencing Commission appears not to have considered 18 U.S.C. § 175(a) when promulgating U.S.S.G. § 2K2.1.

■ Rephrasing our concern in a more general manner, we seriously doubt that a case in which a district court is required to apply the most "analogous" guideline pursuant to U.S.S.G. § 2X5.1 can ever be found to fall within the "heartland" of that guideline. Instead, we believe such a case is, by definition, an "unusual case" and, therefore, a suitable candidate for either an upward or downward departure. We believe the "heartland" of a particular offense guideline (the cases embodying the conduct the guideline describes) is restricted to some subset of cases involving conduct in violation of those statutes *explicitly* referenced either in the commentary following the particular guideline or in the Statutory Index. It makes little sense to conclude that conduct violating a statute for which a guideline has not been promulgated to cover can be found to be within the "heartland" of that guideline while at the same time recognizing, as *Koon* suggests, that certain cases embodying conduct for which the guideline has been expressly formulated to cover could be found to fall outside the "heartland." Therefore, the fact that U.S.S.G. § 2K2.1 was *not expressly* promulgated to cover violations of 18 U.S.C. § 175(a), we believe is sufficient, in and of itself, to take this case outside the "heartland" of cases covered by U.S.S.G. § 2K2.1.

Our conclusion here does not nullify the directive contained in U.S.S.G. § 2X5.1 to apply the most "analogous" guideline. Although each case would be by definition "unusual" and, therefore, a candidate for departure, the selection and application of the most "analogous" guideline still serves an important function within the framework of the Sentencing Guidelines—it provides the starting or reference point within the structure of the Guidelines for violations of statutory provisions the Sentencing Commission has not yet tied to a particular guideline or guidelines. And it is from that starting point that any subsequent departure by the sentencing court, whether upward or downward, must begin.

### 2.

■ In any event, notwithstanding the foregoing analysis, we believe sufficient grounds existed in this case to justify the district court's decision to depart. The district court departed upward from Leahy's adjusted base offense level, because in the district court's opinion U.S.S.G. § 2K2.1 did not adequately reflect the seriousness of Leahy's conduct. Leahy contends that the district court erroneously departed because its decision to depart was not premised upon any factor encouraged as a basis for departure by the Sentencing Commission. We disagree with Leahy and conclude that there were appropriate grounds for departure in this case.

■ In *Koon*, the Supreme Court set forth the analytical framework to be utilized in determining whether an upward departure from the applicable guidelines range is appropriate. District courts are directed to ask:

1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?

2) Has the Commission forbidden departures based on those features?

3) If not, has the Commission encouraged departures based on those features?

4) If not, has the Commission discouraged departures based on those features?

*Koon*, 518 U.S. at 95, 116 S.Ct. 2035 (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993)). The Supreme Court went on to explain the mechanics of applying this framework:

If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is

an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guidelines heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent.

*Id.* at 95–96, 116 S.Ct. 2035 (citations and internal quotations omitted).

In justifying its decision to depart upward, the district court identified four factors it believed took this case out of the "heartland" of cases under U.S.S.G. § 2K2.1. The factors relied upon by the district court were: (1) the maximum penalty for possession of a toxin under 18 U.S.C. § 175(a) is life whereas the maximum penalty for possession of a destructive device is only ten years; (2) the number of toxins possessed by Leahy (two); (3) the high toxicity of ricin, nicotine sulfate, and the mixture of nicotine sulfate and

DMSO; and (4) the potential for mass homicides ricin afforded. We believe these factors, when viewed cumulatively, provide an adequate basis in the record to support the district court's implicit finding that this case was "unusual" and that it warranted an upward departure under U.S.S.G. § 5K2.0.

We begin by noting that the Sentencing Commission has not ruled out any of the factors cited by the district court as a forbidden factor.[7] Nor has the Commission found any of these factors to be a discouraged factor.[8] Instead several of the factors relied upon by the district court are arguably encouraged bases for upward departure under U.S.S.G. §§ 5K2.6 and 5K2.14.

Pursuant to U.S.S.G. § 5K2.6, a district court may increase a defendant's sentence above the authorized guideline range if a "weapon or dangerous instrumentality was used or possessed" during the offense.[9] Leahy argues that U.S.S.G. § 5K2.6 is not a proper basis for departure in this case because the use of ricin as a weapon is an encouraged factor already taken into account under U.S.S.G. §2K2.1 as a specific enhancement under U.S.S.G. § 2K2.1(b)(5). That section provides, in part, that a district court should increase a defendant's offense level by four offense levels "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(5). In this case, the district court imposed the four level enhancement provided in U.S.S.G. § 2K2.1(b)(5) after

---

7. The Sentencing Guidelines identify certain factors that can never be the basis for departure. These "forbidden factors" include race, sex, national origin, creed, religion, socio-economic status, drug or alcohol dependence, economic hardship, or lack of guidance as a youth. *See* U.S.S.G. §§ 5H1.4, 5H1.10, 5H1.12, 5K2.12; *see Koon*, 518 U.S. at 93, 116 S.Ct. 2035. Except for these "forbidden" factors, the Sentencing Guidelines do not "limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. Ch. 1, pt. A, intro. cmt. 4(b); *see Koon*, 518 U.S. at 93, 116 S.Ct. 2035.

8. Discouraged factors include a defendant's age, education, family and community ties, employment record, and mental or emotional conditions. *See* U.S.S.G. §§ 5H1.1, 5H1.2, 5H1.3, 5H1.5, 5H1.6. Generally, these factors are not relevant to the departure decision. *See Koon,*

518 U.S. at 96, 116 S.Ct. 2035 ("If a special factor is a discouraged factor … the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.").

9. Specifically, section 5K2.6 provides:

If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial increase.

U.S.S.G. § 5K2.6.

concluding that Leahy had threatened to use the toxins he had developed on various family members on several occasions.[10] Thus, because the intent to use ricin is inherent in the offense covered by U.S.S.G. § 2K2.1 and the four level enhancement provided in U.S.S.G. § 2K2.1(b)(5), Leahy argues that it would be improper for the district court to depart upward under U.S.S.G. § 5K2.6.

While Leahy is correct that the use of ricin as a weapon is already taken into account by U.S.S.G. § 2K2.1 by virtue of U.S.S.G. § 2K2.1(b)(5), a district court may nevertheless depart upward "if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96, 116 S.Ct. 2035. Thus, even when the applicable offense guideline has taken into consideration a factor listed as an encouraged factor, departure may nevertheless be warranted if the encouraged factor "is present to a degree substantially in excess of that which ordinarily is involved in the offense." *Id.* at 94, 116 S.Ct. 2035 (quoting U.S.S.G. § 5K2.0); *see also Furkin*, 119 F.3d at 1284 (reasoning that a court may depart upward when conduct is taken into consideration by the Sentencing Guidelines but, in light of unusual circumstances, the level attached to that conduct by the Sentencing Guidelines is inadequate).

Given the typical behavior of those who possess a "firearm" under U.S.S.G. § 2K2.1, we believe Leahy's possession of a toxin can be appropriately characterized as "unusual" so as to remove it from the "heartland" of cases to which U.S.S.G. § 2K2.1 applies. As an initial matter, we re-emphasize that U.S.S.G. § 2K2.1 was not promulgated to cover weapons such as toxins, which suggests that this is not an ordinary case involving the use or threatened use of a firearm under U.S.S.G. § 2K2.1(b)(5). In addition, a district court may take into account the "especially dangerous nature of a weapon" when considering an upward departure pursuant to U.S.S.G. § 5K2.6. *See United States v. Joshua*, 40 F.3d 948, 951 (8th Cir.1994). In the present case, the district court noted that ricin is extremely dangerous and that Leahy possessed enough ricin to kill approximately 125 people. Because of the high toxicity of the toxin involved in this case and the deadly consequences that could have resulted from its use, we believe the district court could have properly departed under U.S.S.G. § 5K2.6. *See United States v. Hardy*, 99 F.3d 1242 (1st Cir.1996) (reasoning that to the extent a sentencing court supportably finds that a defendant's choice of weapons and the actual manner of its use increased the danger to "unusual" levels, an upward departure under U.S.S.G. § 5K2.6 would be permissible).

Similarly, under U.S.S.G. § 5K2.14, a district court may depart upward if public health or safety is "significantly endangered" by the defendant's conduct.[11] We believe at

---

**10.** On appeal, Leahy also challenges the district court's finding that he threatened to use the toxins he developed on family members. Leahy claims that he never intended to use ricin as a weapon against any actual person. Instead, he claims that he created the ricin and nicotine sulfate to protect himself from imaginary enemies—against men he believed sought to poison him and his family and had obtained illegal entry into his house and tapped his telephone. In order to protect his home against unauthorized entry, Leahy developed the toxins to place on areas of his home, such as the doorknobs.

Leahy also claims not to remember making any of the threatening statements attributed to him. It appears that Leahy suffers from some form of mental illness for which he has periodically taken medication. Leahy claims that he had stopped taking his medication and that as a result his thinking may have become confused in the months preceding his arrest. Because of these "blackouts," Leahy contends that he can-

not now remember making any threatening statements, although he does not dispute that some witnesses may attribute those statements to him.

At his plea hearing, however, Leahy admitted to possessing ricin and having the ingredients and instructions for its manufacture, admitted that he knew of ricin's deadly characteristics, admitted that he intended to use it as a weapon (regardless of whether he intended to use it to defend himself against real or imagined enemies), and acknowledged that he may well have made the threatening statements attributed to him. Thus, in the proceedings before the district court, Leahy acceded to the district court's characterization of these charges and cannot now be allowed to contest them.

**11.** Section 5K2.14 provides:
If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense.

least two of the factors cited by the district court would have provided a sufficient basis for a finding that Leahy's conduct posed a significant threat to public safety such as to justify an upward departure under U.S.S.G. § 5K2.14. First, the district court referred to the high toxicity of the ricin possessed by Leahy as one factor underlying its decision to depart. Second, the district court expressed its concern about the "potential for mass homicides" the toxins possessed by Leahy afforded him. Relying, in part, on these factors the district court concluded that because the toxins possessed by Leahy were so dangerous, an upward departure was warranted in order to "protect the community from the defendant."

In a similar case, the Ninth Circuit concluded that a defendant's possession of homemade pipe bombs posed a significant threat to public safety warranting an upward departure under U.S.S.G. § 5K2.14. *See United States v. Loveday,* 922 F.2d 1411 (9th Cir. 1991); *accord United States v. Dempsey,* 957 F.2d 831, 833–34 (11th Cir.1992) (concluding that the defendant's possession of two homemade pipe bombs and one handmade grenade posed a significant risk to public safety warranting an upward departure under U.S.S.G. § 5K2.14 because of the "diabolical" nature of the destructive devices). In *Loveday,* the Ninth Circuit reasoned that while the pertinent guideline applied to the possession of a bomb,[12] the Sentencing Commission "did not have in mind the unique dangers homemade bombs pose to public safety." *Loveday,* 922 F.2d at 1415. The court reasoned that, unlike firearms which can be used for sport or recreation, pipe bombs "have no legitimate purpose." *Id.* at 1416. Instead, pipe bombs "have the potential to kill indiscriminately, without warning, and with less chance that the perpetrator will be caught." *Id.* This same characterization can be applied to a toxin such as ricin. As we previously stated, ricin is an extremely dangerous substance; one for which there is no known antidote. Similarly, ricin is not detectible once dissemi-

nated, and there are no identifiable symptoms for those infected with the toxin. Clearly, ricin, like homemade bombs, is not a danger the Sentencing Commission had in mind when it formulated U.S.S.G. § 2K2.1.

Another factor relied upon by the court in *Loveday,* which is also present in the instant case, is that the amateur construction of lethal devices, such as toxins, can contribute towards their instability. *See id.* at 1416–17. As the Ninth Circuit explained, when such devices are manufactured and stored in residences, they pose a danger to public safety not present in commercial firearms. *Id.* Similarly, in the present case, Leahy produced ricin in a residential area apparently without concern for its accidental dissemination. Based on the dangerous nature of ricin and the circumstances surrounding Leahy's manufacture of it, we believe Leahy's conduct posed a significant threat to public safety and welfare and that a departure would have been warranted under U.S.S.G. § 5K2.14. *See United States v. Stumpf,* 938 F.2d 172, 174 (10th Cir.1991) (concluding that upward departure was justified under U.S.S.G. § 5K2.14 when the defendant constructed highly volatile bombs in a residential area without regard to the safety of others).

In light of the foregoing considerations, we believe Leahy's conduct falls outside of the "heartland" of cases contemplated by the Sentencing Commission in formulating U.S.S.G. § 2K2.1. Accordingly, we conclude that the district court did not abuse its discretion in departing upward from the applicable guideline range provided by U.S.S.G. § 2K2.1.

### B. *The District Court's Factual Findings Were Not Clearly Erroneous*

We can dispense with the second step of our review—whether the "unusual" circumstances justifying the upward departure actually existed—with relative ease. A district court's findings of fact are to be accepted on appeal unless they are clearly erroneous.

---

U.S.S.G. § 5K2.14.

**12.** The guideline provision covering defendant's conviction in *Loveday,* U.S.S.G. § 2K2.2, "Receipt, Possession, or Transportation of Firearms

and Other Weapons in Violation of National Firearms Act," was subsequently consolidated with U.S.S.G. § 2K2.1. *See* U.S.S.G. app. C, amends. 189, 333, 374.

*See United States v. Almaguer,* 146 F.3d 474, 476 (7th Cir.1998). In this case, Leahy did not seriously contest the factual findings underlying the district court's decision to depart upward. At his plea hearing, Leahy admitted that he knowingly possessed those toxins charged in the superseding indictment and that he possessed those toxins for use as a weapon. Moreover, Leahy did not contest the district court's finding as to the extremely dangerous character of those toxins. Therefore, we conclude that the record adequately supports the district court's factual findings.

### C. The Extent Of The District Court's Upward Departure Was Unreasonable

■ Having determined that the grounds underlying the upward departure were appropriate and that the district court's factual findings were not clearly erroneous, we must now decide whether the district court's decision to depart upward ten levels was reasonable.

■ A district court's determination of the extent of an upward departure is by nature a discretionary decision. *See United States v. Horton,* 98 F.3d 313, 317 (7th Cir. 1996). However, while a district court's findings on the degree of departure are normally given deference, *see United States v. Sarna,* 28 F.3d 657, 661 (7th Cir.1994), every departure from the Sentencing Guidelines must be "reasonable" in extent. *See Billingsley,* 115 F.3d at 466; *Horton,* 98 F.3d at 317.

■ Although there are no hard and fast rules for determining the extent of an upward departure, this Court has "approved of a method that involves calculating the defendant's sentence by analogy to existing guideline provisions." *Horton,* 98 F.3d at 317; *see Billingsley,* 115 F.3d at 466. As we have recently stated:

> [N]o rigid rule exists for computing an upward departure. The law merely requires that district judges link the degree of departure to the structure of the Guidelines and justify the extent of the departure taken. To make its assessment, the district judge need only draw an analogy

between the defendant's actions and the conduct discussed in the Guidelines.

*United States v. Scott,* 145 F.3d 878, 886 (7th Cir.1998) (citations omitted). Thus, a district court should determine the extent of an upward departure "by comparing the seriousness of the aggravating factors that motivate the departure with the adjustments in base offense level prescribed by the guideline provisions that apply to conduct most closely analogous to the defendant's offense conduct." *Horton,* 98 F.3d at 317.

While this Court has approved of looking to an analogous sentencing guideline in measuring the extent of a departure, we must be mindful that the analogy selected is an appropriate one. *See id.* Leahy claims the district court erred in looking to U.S.S.G. § 3A1.4 for guidance in determining the extent of the upward departure and, as a result, the court's upward departure was unreasonable. Upon close review, we agree.

The reasoning we employed in *Horton* appears to be dispositive of this issue. In *Horton,* the defendant pleaded guilty to making a bomb threat against a federal building in violation of 18 U.S.C. § 844(e). *Id.* at 314. The defendant made his threat one day after the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma. *Id.* Although no explosive device was found, the bomb threat significantly disrupted the activities of the federal government. *Id.* at 315. One hundred and twenty-three federal employees and many members of the public had to be evacuated from the building, an exhaustive multi-agency search for the bomb ensued, and as a result fourteen federal agencies remained closed until the following morning. *Id.*

At sentencing, the government argued that the district court should consider an upward departure pursuant to U.S.S.G. § 5K2.7 because the defendant's threat resulted in a "significant disruption of a governmental function." *See id.* at 316; U.S.S.G. § 5K2.7. The district court agreed and departed upward eight levels from the base offense level that otherwise would have been applicable to the defendant's offense. *See Horton,* 98 F.3d at 316. The court reasoned that such a departure would be appropriate given the

grave nature and the unfortunate timing of the defendant's bomb threat. *See id.* The district court arrived at its eight level upward departure by considering, in part, the six level enhancement provided in U.S.S.G. § 2A6.1(b)(1)—the guideline provision that applies to threatening communications accompanied by "conduct indicating that the defendant intends to carry out such threat." *Id.* at 318 (citing U.S.S.G. § 2A6.1(b)(1)). While conceding that some level of upward departure pursuant to U.S.S.G. § 5K2.7 may well have been warranted because the bomb threat did disrupt governmental functions, the defendant attacked the reasonableness of the extent of the upward departure imposed by the district court. *See id.* at 317.

We agreed with the defendant in *Horton* that the extent of the departure was unreasonable concluding that the district court had erred in linking the extent of its upward departure to U.S.S.G. § 2A6.1(b)(1). *Id.* at 318. In order for the enhancement provided in U.S.S.G. § 2A6.1(b)(1) to be an appropriate analogue for determining the extent of the upward departure in *Horton*, we reasoned that the defendant must have engaged in conduct beyond the bounds of making an empty threat because U.S.S.G. § 2A6.1(b)(1) required the defendant to take some action that demonstrated his willingness to carry out his threat. *Id.* at 318–19. Because the defendant "did not engage in any conduct that demonstrated an intent to plant an explosive device in the Federal Building," we concluded that the district court chose an inappropriate analogy for determining the extent of the upward departure. *Id.* at 318. As a result, we found the extent of the resulting departure to be unreasonable. *Id.*

Similarly, in the instant case, the district court properly turned to the Sentencing Guidelines in an attempt to determine the proper extent of the resulting departure, once it determined that an upward departure was warranted. As we previously stated, the district court used the Terrorism enhancement provided in U.S.S.G. § 3A1.4 as an analogue to measure what would be a reasonable and appropriate departure in this case.

However, as was the case in *Horton*, we do not believe the underlying facts of this case warrant a linkage to U.S.S.G. § 3A1.4.

In order for the district court's analogy to the Terrorism guideline to be appropriate, Leahy must have committed an offense "that involved, or was intended to promote, a federal crime of terrorism." *See* U.S.S.G. § 3A1.4. The term "federal crime of terrorism" is defined as an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of, among other provisions, 18 U.S.C. § 175 (relating to biological weapons). *See* 18 U.S.C. § 2332b(g)(5). While Leahy did violate 18 U.S.C. § 175(a), there is absolutely no evidence in the record that Leahy sought to influence or affect the conduct of the government. In fact, the district court itself readily concluded that Leahy did not engage or attempt to engage in any act of terrorism. The court stated that "[b]ecause this is not an actual act [or] attempted act of terrorism, the Court elects to depart upward only ten levels ... [and][f]or the same reason, the Court does not increase the Criminal History Computation." Thus, we must conclude here, as we did in *Horton*, that the district court, in selecting U.S.S.G. § 3A1.4, chose an inappropriate analogy for determining the extent of the upward departure in this case. *See also United States v. Baldwin*, 5 F.3d 241, 242 (7th Cir.1993) (finding it improper for the district court to depart upward under a guideline that required a dangerous weapon be "used or possessed in the commission of the offense" when there was no evidence that the defendant used or possessed a dangerous weapon during the offense of conviction). As a result, we must find the upward departure in this case to be unreasonable.

This conclusion is further supported when we look to those guidelines promulgated to cover offenses prohibited by 18 U.S.C. § 2332a, which the district court initially relied upon in determining the extent of Leahy's upward departure before turning to U.S.S.G. § 3A1.4.[13] 18 U.S.C. § 2332a, by its

---

**13.** We must note at the outset, however, that we do not intend the following analysis to be inter-

preted by the district court as suggesting that any particular guideline we discuss would provide

express terms, appears to cover more closely that conduct the district court seeks to attribute to Leahy. Section 2332a punishes the use, attempted use, or threatened use of a weapon of mass destruction, "including any biological agent, toxin, or vector." 18 U.S.C. § 2332a(a). By comparison, section 175(a) punishes any person who develops, produces, or possesses any biological agent, toxin, or delivery system for use as a weapon. 18 U.S.C. § 175(a). Thus, section 2332a punishes the use (or attempted or threatened use) of weapons of mass destruction while section 175(a) merely seeks to punish acquisition and possession of those same weapons.

While there was no evidence introduced in this case that Leahy actually used, or even attempted to use, the toxins against any person, there was some evidence that Leahy had *threatened* to use the toxins he had developed against various family members and friends. Because 18 U.S.C. § 2332a purports to punish any person who "threatens" to use a weapon of mass destruction (including any toxin), arguably one of the guidelines promulgated to cover conduct prohibited by section 2332a could provide an appropriate analogy for an upward departure in this case as there was at least some evidence that Leahy engaged in that type of conduct.

As we have previously stated, the Sentencing Commission refers to a number of guidelines for violations of section 2332a including: U.S.S.G. §§ 2A1.1 (First Degree Murder); 2A1.2 (Second Degree Murder); 2A1.3 (Voluntary Manslaughter); 2A1.4 (Involuntary Manslaughter); 2A1.5 (Conspiracy or Solicitation to Commit Murder); 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder), 2A2.2 (Aggravated Assault); 2B1.3 (Property Damage or Destruction); and 2K1.4 (Arson; Property Damage by Use of

Explosives). Because Leahy did not cause the death of any person, none of the guidelines that cover offenses resulting in actual death would be appropriate. Thus, under the rationale employed in *Horton*, this would preclude U.S.S.G. §§ 2A1.1 thru 2A1.4 from serving as appropriate analogues in determining the extent of an upward departure in Leahy's case. Similarly, U.S.S.G. § 2A1.5 would be inappropriate because there was no evidence indicating that Leahy conspired to commit or solicited murder. In addition, by their express terms, both U.S.S.G. § 2B1.3 and U.S.S.G. § 2K1.4 are clearly inapplicable to the facts of Leahy's case. This would appear to leave either section 2A2.1 or 2A2.2 as the appropriate guideline or guidelines for the "threatened use" of a weapon of mass destruction.

While neither of these guidelines, by their terms, appear to cover "threats," they are nevertheless useful because they illustrate that the district court's upward departure in this case had the effect of imposing a longer sentence upon Leahy than he likely would have received had he actually attempted to use the ricin against a person without killing them—an offense more serious than the mere possession or threatened use of a prohibited toxin. For example, under U.S.S.G. § 2A2.1, the attempted murder guideline, Leahy's initial base offense level would be either twenty-eight or twenty-two, depending on whether the object of the offense would have constituted first degree murder.[14] *See* U.S.S.G. § 2A2.1. Assuming Leahy's hypothetical attempt resulted in no harm to the intended victim, Leahy's adjusted base offense level, after subtracting three levels for acceptance of responsibility, would be either twenty-five or nineteen. Even if Leahy's attempt had been partially successful, in that

---

the "appropriate" analogy for an upward departure in this case. Instead, we refer to certain guidelines merely to show that the district court's reliance on U.S.S.G. § 3A1.4 was inappropriate in the context of this case.

**14.** Section 2A2.1, "Assault with Intent to Commit Murder; Attempted Murder," provides:
  (a) Base Offense Level:
    (1) **28**, if the object of the offense would have constituted first degree murder; or
    (2) **22**, otherwise.
  (b) Specific Offense Characteristics

(1)(A) If the victim sustained permanent or life-threatening bodily injury, increase by **4** levels; (B) if the victim sustained serious bodily injury, increase by **2** levels; or (C) if the degree of injury is between that specified in subdivisions (A) and (B), increase by **3** levels.
(2) If the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by **4** levels.
U.S.S.G. § 2A2.1.

it resulted in some injury to the victim, under the specific offense characteristics provided in U.S.S.G. § 2A2.1(b), Leahy's offense level could be increased, at most, by four levels, depending on the nature of the injury suffered by the victim. *See* U.S.S.G. § 2A2.1(b)(1). Thus, in a worst case scenario from Leahy's perspective, one in which Leahy attempts to murder someone and his attempt results in permanent injury, but not death, Leahy's offense level would be either twenty-nine or twenty-two.

Similarly, according to our calculations, Leahy's maximum potential base offense level under U.S.S.G. § 2A2.2, the aggravated assault guideline, would be around twenty-five. As provided in U.S.S.G. § 2A2.2(a), Leahy's initial base offense level for aggravated assault with a toxin would be fifteen. If we factor in possible specific offense characteristics: two levels under U.S.S.G. § 2A2.2(b)(1) for an assault involving more than minimal planning, five levels under U.S.S.G. § 2A2.2(b)(2) for the discharge of a firearm, and six levels for permanent bodily injury; Leahy's base level would be twenty-eight. After subtracting three levels for acceptance of responsibility, Leahy's adjusted base offense level would be twenty-five. Thus, even if we assume that Leahy's hypothetical aggravated assault involved more than minimal planning, that Leahy used ricin during the assault, and that the assault resulted in permanent injury to the victim, Leahy's adjusted base offense level would still be only twenty-five.

In comparison, the district court determined Leahy's adjusted base offense level for the possession of ricin in the present case to be thirty-one. Thus, we find it significant that Leahy could have attempted to use the toxin, even causing significant injury to a victim, and potentially have received a less severe sentence than that which the district court imposed for Leahy's conduct in possessing a toxin. Because these are the types of sentencing ranges Leahy could have received had he committed a more serious offense, a departure logically should not exceed these levels. *See United States v. Ferra*, 900 F.2d 1057, 1063 (7th Cir.1990) ("It would throw the structure of the guidelines out of kilter to say that a defendant may receive more time on a 'departure' than he could have received had he been convicted of the crimes leading to the judge to depart.").

Accordingly, we conclude that the district court abused its discretion in departing upward ten levels.

### III.  CONCLUSION

Because there was no evidence showing that Leahy engaged in an actual act or attempted act of terrorism, we conclude that the district court, in selecting U.S.S.G. § 3A1.4, chose an inappropriate analogy for determining the extent of the upward departure in this case. As a result, we hold that the district court abused its discretion in imposing a ten level upward departure. Therefore, we VACATE Leahy's sentence and REMAND for resentencing in accordance with this opinion.