**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wade LOVEDAY, Defendant–Appellant.**

**No. 89–50388.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1990.

Decided Jan. 8, 1991.

---

Kathryn A. Thickstun, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Larry A. Burns and Nancy Worthington, Asst. U.S. Attys., San Diego, Cal., for plaintiff-appellee.

Before HUG, SCHROEDER and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Wade Loveday pleaded guilty to one count of possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). The district court departed upward from the Sentencing Guidelines ("the guidelines") in imposing a sentence of twenty-four months of imprisonment followed by three years of supervised release. Loveday argues on appeal that this departure was both impermissible and unreasonable. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and affirm the sentence imposed by the district court.

I

The presentence report details the following facts. In early October 1988, an investigation of one Robert Anderson led to the discovery of three pipe bombs in his home.[1] The most dangerous of these, an incendiary bomb, was found in a "Toys–R–Us" box in Anderson's bedroom closet. It consisted of a pipe bomb attached to a one-gallon container of gasoline; inside the bomb was a small bottle filled with shrapnel. The other two bombs were made of copper pipe, crimped at both ends. Loveday was implicated in the manufacture of these bombs.[2]

On October 31, 1988, agents of the Bureau of Alcohol, Tobacco and Firearms executed a search warrant at Loveday's home in El Cajon, California. Five completed or partially completed bombs were found in his bedroom. Three were pipe bombs, ranging from four-and-one-half to six inches in length. Another was simply a pill container filled with gunpowder, with a fuse inserted through a hole in the cap. The fifth was a partially constructed bomb consisting of a small bottle filled with a petroleum product and a shotgun shell filled with shot and metal screws. The agents also found "how-to" manuals, which appeared to be in Loveday's handwriting, describing how to manufacture bombs and napalm, and various materials used in the fabrication of bombs.

According to the government, the materials found in Loveday's home provided further evidence that Loveday had manufactured the pipe bombs discovered in Anderson's residence. The ends of each of the pipe bombs found in both residences were crimped and folded in a consistent, "signature" manner. The fusing was identical, and the specific combination of gun powder was consistent. Loveday admitted knowing Anderson, but denied having made any bombs for him.

On November 8, 1988, Loveday was charged with nine counts of manufacturing and six counts of possessing destructive devices in violation of the National Firearms Act, 26 U.S.C. §§ 5861(f) and 5861(d).[3] The charged offenses included the manufacture of the three bombs found in Anderson's residence. On April 26, 1989, pursuant to a plea agreement with the government, Loveday pleaded guilty to a single count: possession of the six-inch

---

1. Anderson later pleaded guilty to violating 21 U.S.C. 841(a), manufacture of a controlled substance, and 26 U.S.C. 5861(d), possession of a destructive device.

2. A confidential informant first linked Loveday to the bombs. Loveday later admitted to the informant, who was wearing a transmitter at the time, that he had manufactured the gasoline bomb. This admission was verified by Anderson's roommate, who told a Bureau of Alcohol, Tobacco, and Firearms agent that Love-

day had delivered the "Toys–R–Us" box to the residence she shared with Anderson, that Loveday stated at the time that he "didn't want to be driving around with it," and that Anderson had told her that the box contained a bomb.

3. Two of the fifteen counts were subsequently dismissed after it was discovered that one of the bombs Loveday was charged with manufacturing and possessing did not have explosive capabilities.

pipe bomb found in his bedroom. In exchange for the plea, the government agreed to dismiss the remaining counts and to recommend a sentence of no more than twenty-four months in custody. The plea agreement thus contemplated a departure from the sentencing guidelines.

Under the version of the guidelines then in effect,[4] the sentencing range in Loveday's case was from ten to sixteen months.[5] Consistent with the plea agreement, the presentence report recommended an upward departure to twenty-four months in custody and three years of supervised release.[6] After hearing argument from Loveday and the government, the district court accepted the report's recommendation and sentenced Loveday accordingly. This appeal followed.

## II

We begin with whether the district court's departure from the guidelines was permissible. A district court may depart from the range prescribed in the guidelines in three limited situations. *United States v. Nuno–Para*, 877 F.2d 1409, 1413 (9th Cir.1989) (citing United States Sentencing Commission, *Guidelines Manual*, Ch. 1, Part A, Introduction 4(b)). Two are at issue in this case: (1) where aggravating or mitigating factors have not been adequately considered by the Commission; and (2) where the guidelines provide specific guidance for departure by analogy or by other suggestion. *Id.* A sentencing judge departing from the applicable guideline range must state specifically his or her reasons for doing so. 18 U.S.C.A. § 3553(c) (West Supp.1990); *see also United States v. Ramirez Acosta*, 895 F.2d 597, 601 (9th Cir. 1990); *United States v. Michel*, 876 F.2d 784, 786 (9th Cir.1989).

■ We find that the aggravating circumstances warranting departure were adequately identified. The district court stated two grounds for departure: (1) "the nature of the devices" manufactured and possessed by Loveday, which the court described as having "no social utility"; and (2) the "danger to society" they posed. In addition, the court twice stated that it

4. Effective November 1, 1989, the guidelines provision governing Loveday's conviction, § 2K2.2, "Receipt, Possession, or Transportation of Firearms and Other Weapons in Violation of National Firearms Act," was amended and renumbered as § 2K2.1, "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition." United States Sentencing Commission, *Guidelines Manual*, Appendix C, ¶ 189 (Nov. 1, 1989). We apply the version then in effect. *United States v. Carvajal*, 905 F.2d 1292, 1294 (9th Cir.1990). Unless indicated to the contrary, all references to the guidelines in this opinion are to *Guidelines Manual* (Oct. 15, 1988).

5. The base offense level for possession of an unregistered firearm was 12. U.S.S.G. § 2K2.2(a). Because of Loveday's acceptance of responsibility, two levels were subtracted, leaving a final base level of 10. His criminal history was calculated at 4, placing him in Category III. A Category III criminal history and a base offense level of 10 produced a guideline range for imprisonment of 10 to 16 months. U.S.S.G. Ch. 5, Part A (sentencing table).

6. The report justified departure for the following reasons:

The search of LOVEDAY's residence revealed approximately five pipe bomb type devices, which there appears to be no legitimate use for other than to be destructive devices. Also found in LOVEDAY's bedroom were several narcotic pills and methamphetamine was found in the living room. The undersigned believes that an upward departure beyond the suggested guideline range is warranted due to the number of bombs found in LOVEDAY's residence, and the evidence that indicates that LOVEDAY manufactured the gasoline can attached to a pipe bomb found in Anderson's residence. The undersigned believes that the defendant is being less than candid and is a danger to the community.

The structure of the probation officer's report is somewhat confusing, but its conclusions are clearly stated. The passage quoted above is taken from the "Justification" section of the sentencing recommendation. However, under Part F, "Factors That May Warrant Departure," the report refers only to narcotic pills and methamphetamine seized from Loveday's home. Nevertheless, it is apparent from the objections Loveday filed in opposition to the presentence report and the proceedings in open court that the parties and the sentencing judge relied upon the "Justification" section as the sole basis for the report's recommended departure. There is nothing in the record to suggest that the drugs, which were later linked to a third party, played any role in the court's decision to depart upward from the guidelines.

adopted the presentence report, which elaborated on these grounds in recommending an upward departure.[7]

■ Loveday maintains that departure was impermissible because the nature of the devices and the threat they posed to public safety were adequately considered by the Commission in drafting section 2K2.2, the section governing his conviction. We disagree.

Loveday argues that the Commission, by entitling the chapter covering his conduct "Offenses Involving Public Safety," clearly took account of the threat firearms pose to public safety. He refers us to *United States v. Uca*, 867 F.2d 783 (3d Cir.1989), where the Third Circuit observed that

> [p]ublic safety represents a prime consideration whenever restrictions are placed on guns. If any doubt about this existed, the fact that the Guidelines governing firearms violations are included in a part entitled "Offenses Involving Public Safety" removes that doubt.

867 F.2d at 790. We do not disagree that public safety was taken into account by the Commission in drafting section 2K2.2. Here, however, we deal not with guns, but with bombs. Our reading of section 2K2.2 suggests that the Commission did not have in mind the unique dangers homemade bombs pose to public safety.

While the guideline itself unquestionably applies to the mere possession of a bomb, *see* U.S.S.G. § 2K2.2, comment. (backg'd) (listing "destructive device" as a "firearm" within the meaning of the National Firearms Act), the specific offense characteristics under the section are wholly inapplicable to the bombs possessed and manufactured by Loveday. *See* § 2K2.2(b)(1) (increasing base level for firearms stolen or having obliterated serial number); § 2K2.2(b)(2) (increasing base level for use of silencer); § 2K2.2(b)(3) (decreasing base level for weapons used for "sport, recreation or collection"). Loveday argues, however, that his conduct falls within section 2K2.2(b)(3). He suggests that in providing

7. In addition to the grounds cited above, the presentence report specifically mentioned the number of bombs as a ground for departure. *See supra* note 6. Despite the report's inclusion of this fact, the record suggests that the court and the parties understood that the court departed from the guidelines because of the nature of the devices and the threat they posed to public safety, and not because of the number of bombs possessed by Loveday.

At the sentencing hearing, Loveday's counsel argued that departure was unwarranted because, by analogy to section 2K2.3, "Prohibited Transactions in or Shipment of Firearms and Other Weapons," the guidelines account for possession of multiple weapons. *See* U.S.S.G. § 2K2.3(b)(1). The government disagreed. It urged the court to depart, not on the basis of the number of weapons, but on their nature. As the following colloquy illustrates, the court agreed with the government, limiting its grounds for departure to the nature of the devices and the threat they posed to public safety.

MR. BURNS: I would ask the court to concentrate instead, as a basis for departure, on the nature of the weapons.

. . . .

It would seem to me that explosive devices, particularly pipe bombs which have no social utility, would be at the aggravated end of the guideline range.

As the probation office notes, our proof was that Mr. Loveday made at least one bomb that was incendiary in nature that had a gallon of gasoline attached to a pipe bomb. I think that puts him in the category of danger to community and justifies the recommendations for departure.

I would ask the court to make a factual finding that the nature of the device, if nothing more, justifies the departure that's recommended.

THE COURT: All right. Thank you.

. . . .

Ms. Thickstun, I realize I am talking to a larger audience; but for your presentation, to devote it to the guidelines and recommendations and upward levels, putting it on a grid has changed irrevocably the traditional sentencing hearing where I hear why I should do something for this man and why I shouldn't; and I consider that a real tragedy of our times. Putting that to one side, *I agree with the analysis of Mr. Burns.*

I think the nature of the devices here that were made have no social utility and can only be a danger to society.

Mr. Loveday, I agree. You are not a career criminal. I agree with that; But, I also bring to your mind, and I think you would accept simple accountability; what you were doing— *what the purpose of the things were for*—in my judgment, the bill collector comes for you like he comes for all of us.

for a six point downward adjustment for a recreational firearm, "the Commission addressed the social utility of some weapons, while leaving those weapons with a more sinister purpose at the base offense level of 12." We cannot agree.

The background commentary to section 2K2.1, which is cross-referenced in the commentary to section 2K2.2, strongly suggests that the Commission's focus in drafting section 2K2.2(b)(3) was on guns rather than bombs.

> Statistics show that sentences average two to three months lower if the firearm involved is a rifle or an unaltered shotgun. This may reflect the fact that these weapons tend to be more suitable than others for recreational activities. However, some rifles or shotguns may be possessed for criminal purposes, while some handguns may be suitable primarily for recreation. Therefore, the guideline is not based upon the type of firearm. Intended lawful use, as determined by the surrounding circumstances, is a mitigating factor.

U.S.S.G. § 2K2.1, comment. (backg'd). Given this emphasis on guns, the background commentary to section 2K2.2 notes that some violations "may be relatively technical." While technical differences are certain to arise under section 2K2.2(b)(3) in determining whether a particular firearm, such as a short-barrelled rifle, is intended for "sport, recreation, or for collection," no such "technical" distinctions apply to pipe bombs, which have no legitimate purpose and which have the potential to kill indiscriminately, without warning, and with less chance that the perpetrator will be caught. The mere fact that section 2K2.2(b)(3) provides for a reduction in sentence for certain guns does not preclude an upward departure for weapons which the Commission evidently failed to consider in drafting the guideline.

■ Even if section 2K2.2(b)(3) applied to homemade bombs, it would be inapplicable in this case, given Loveday's overall conduct. In *United States v. Michael*, 894

F.2d 1457 (5th Cir.1990), the defendant, who had manufactured and placed a pipe bomb under a co-worker's car, argued that his reckless use of the bomb was conduct already contemplated in the drafting of section 2K2.2(b)(3), and that an upward departure was therefore unwarranted. *Id.* at 1460 n. 2. In dicta, the court rejected this argument, concluding that section 2K2.-2(b)(3) "encompasses only a distinction drawn on the basis of the purpose of possession; it does *not* distinguish between possession that is accompanied by dangerous uses and mere possession." *Id.* Loveday's conduct, while not as immediately life-threatening as that of the defendant in *Michael*, involved possession "accompanied by dangerous uses." The gasoline bomb manufactured for Anderson was undeniably lethal, and was provided to Anderson with Loveday's certain knowledge that it could inflict substantial personal injury and structural damage. *Compare United States v. Schular*, 907 F.2d 294, 297 (2d Cir.1990) (in enacting section 2K2.3(b)(2)(A), Commission "did not take into account the imminent risk to public safety presented by sales to persons who, regardless of their ability to *obtain* firearms legally, intended to commit violent crimes with firearms legally, intended to commit violent crimes with firearms provided by a seller who knows their customers' criminal intentions"). The other pipe bombs likewise had the potential to inflict personal injury. The components of these bombs and the unassembled bomb found in Loveday's residence belie his claim that he intended them as "firecrackers for Halloween or 4th of July."

Lastly, we note another distinction between the circumstances of Loveday's case and those anticipated by the guidelines. Whatever "technical" classifications may be applicable to professionally manufactured destructive devices are inapplicable here. Given the lethal components of the bombs Loveday manufactured, their amateur construction in his home, the likely instability of a homemade bomb, and the fact that all the devices seized were stored

in residential bedrooms, they posed a danger to public safety not present in other commercial firearms.

We thus conclude that Loveday's manufacture and possession of homemade bombs posed a risk to public safety that is " 'an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.' " U.S.S.G. § 5K2.0 (quoting 18 U.S.C.A. § 3553(b) (West Supp.1990)).

■ We also find that section 5K2.14 provides an alternative basis for departure. That section states:

> If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstance of the offense.

U.S.S.G. § 5K2.14. Departure is warranted under this section "only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense of conviction." U.S.S.G. § 5K2.0. As discussed above, Loveday's conduct posed a threat to public safety "substantially in excess of that ordinarily involved in the offense," and departure was therefore warranted under section 5K2.14 as well.

■ Finally, Loveday argues that the upward departure was impermissible in that it was based on additional counts for which he was not convicted.[8] "[T]he Commission was careful to specify the different ways in which misconduct not resulting in conviction could be taken into account in determining punishment." *United States v. Kim,* 896 F.2d 678, 683 (2d Cir.1990). Section 5K2.0 states that "[h]arms identified as a possible basis for departure from the guidelines should be taken into account only when they are relevant to the offense of conviction, within the limitations set forth in § 1B1.3." U.S.S.G. § 5K2.0.[9] In *Kim,* the Second Circuit explained this limitation as follows:

> We conclude that, with respect to acts of misconduct not resulting in conviction, the Commission intended to preclude departures for acts bearing no relationship to the offense of conviction, but to permit departures for acts that relate in some way to the offense of conviction, even though not technically covered by the definition of relevant conduct.

896 F.2d at 684. Loveday's conduct in manufacturing the three bombs possessed by Anderson, particularly the incendiary device, certainly relates to the offense of conviction, and thus was properly considered by the district court in departing from the guidelines.[10]

### III

■ Having concluded that the district court's decision to depart from the guidelines was permissible, we now turn to whether the departure was "unreasonable" within the meaning of 18 U.S.C.

---

8. He also asserts that the court should have grouped the counts of the indictment under section 3D1.2(d). We disagree. No grouping was in order as section 3D1.2(d) applies only to counts for which the defendant was convicted, *see* U.S.S.G. Ch. 3, Pt. D, intro. comment., and Loveday pleaded guilty to only one count.

9. We note that this language has since been deleted from the guidelines because it was "unclear and overly restrictive." U.S.S.G. App. C, ¶ 358 (Nov. 1, 1990). We express no opinion as to how this amendment will affect departures under section 5K2.0.

10. Loveday does not directly challenge on appeal the sufficiency of the evidence linking him to the bombs seized at Anderson's residence; in a passing reference, he notes that the only proof supporting that link was presented in the indictment. In the court below, however, no objections were made. In filing two written objections to the presentence report he objected to neither the inclusion of detailed information about those bombs in the report nor the specific use by the probation officer of that information in recommending an upward departure. Moreover, Loveday accepted a guilty plea which contemplated an upward departure and which was presumably based on the strength of the evidence against him. Nothing in the record leads us to believe the evidence that Loveday manufactured bombs for Anderson lacked a "sufficient indicia of reliability to support its probable accuracy." *See* U.S.S.G. § 6A1.3(a).

§ 3742(e)(3). In assessing reasonableness, we look to the purposes of sentencing and the reasons the district court gave in departing from the guidelines. *United States v. Borrayo*, 898 F.2d 91, 93 (9th Cir.1989).

■ While this is a case in which the guidelines provide neither specific guidance nor a ready analogy for departure,[11] *see United States v. Gomez*, 901 F.2d 728, 729 (9th Cir.1990), the district court must nevertheless articulate on the record how it arrived at the sentence imposed, *see United States v. Todd*, 909 F.2d 395, 398 (9th Cir.1990). Here, the district court did so.[12]

The sentence imposed was only eight months above the guideline range and was one-fifth the statutory maximum. Moreover, it reflected the plea agreement, which both the defendant and the government considered reasonable at the time they entered into it. On this record we cannot say, given the threat to public safety posed by Loveday's conduct, that the sentence imposed was unreasonable.

## IV

Appellant's sentence is AFFIRMED.

---

11. We disagree with Loveday's contention that departure in this case should be guided by analogy to section 2K2.3(b)(1). Since the district court's departure was based on the nature, rather than the number, of the weapons manufactured by Loveday, *see supra* note 7, any such analogy is inapplicable.

12. In imposing Loveday's sentence, the court stated:

I think, for the reasons set out in the probation report, which I consider good and valid and I accept them in all regards, and particularly the reason for the upward departure, I feel a reasonable and appropriate sentence in this case is twenty-four months. That's what I intend to do.

