Revised November 16, 1999

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 98-20437

————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID JENNINGS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

November 10, 1999

Before DUHÉ, BARKSDALE and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

David Jennings appeals two convictions: (1) possession of a firearm (a .38 revolver) in relation to a "crime of violence" (possession of an unregistered pipe bomb); and (2) attempted interference with interstate commerce in violation of the Hobbs Act. We affirm.

**I.**

David Jennings planned to extort money from workers and customers of day care centers and

medical offices by threatening them with homemade bombs. Jennings described his plans in detail to police informant Jesus "Chuy" Herrera. After telling Chuy that he owned a gun and that he knew how to make a bomb with a remote starter, Jennings asked him to find help to execute the plan.

Chuy then brought several law enforcement officials to meet with Jennings, introducing the agents as his cousins. Jennings discussed with these officials his plan to extort money from the dental office of Orie Gardner, D.D.S., in Baytown, Texas. Jennings planned to remove Dr. Gardner, her assistants, and her patients from the office, take them to a remote location, and hold them for ransom. In a recorded conversation with undercover ATF officer Ismael Rodarte, Jennings expressed his hope that children were at the office when he struck, as he believed their parents would pay substantially for their return. Jennings believed that profits from this plan would fund larger schemes in the future.

Agent Rodarte asked Jennings to bring all of his equipment to a meeting at the Republic of Texas Park in Baytown. At the meeting, Jennings showed Rodarte his .38 revolver, several pipe bombs, knives, gloves, and rope. After Rodarte convinced Jennings to leave the tools in his car, the Baytown police and bomb squad appeared, and Jennings was arrested. After the arrest, police found four functional pipe bombs and a .38 revolver inside a briefcase in Jennings's car. A search of Jennings's home revealed four other pipe bombs and assorted electronic equipment used to construct them.

Jennings was indicted on five counts: possession of an unregistered pipe bomb in violation of 26 U.S.C. § 5861(d) (count 1), solicitation to interfere with commerce by extortion in violation of the Hobbs Act, 18 U.S.C. §1951 (count 2), carrying a firearm (a .38 caliber revolver) during a crime of violence (both possession of the unregistered pipe bomb and solicitation to interfere with commerce by extortion) in violation of 18 U.S.C. § 924(c) (count 3), attempted interference with

commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (count 4), and carrying a pipe bomb during the interference with commerce by extortion, in violation of 18 U.S.C. § 924(c) (count 5).

At trial, Jennings moved to dismiss count 3, arguing that neither possession of a pipe bomb nor solicitation to commit a Hobbs Act violation were "crimes of violence." The district court granted the motion with respect to solicitation, but denied it with respect to possession of a pipe bomb. Instead, finding that possession of an unregistered pipe bomb qualifies as a "crime of violence" as defined by statute, the district court instructed the jury that possession of a pipe bomb was a "crime of violence" as a matter of law.

Jennings also objected to the jury instructions on count 4, arguing that he could only constitutionally be convicted of that offense if his conduct had a "substantial effect" on interstate commerce. The district court overruled the objection, instructing the jury that the conduct only had to have an "effect" on interstate commerce.

The jury convicted Jennings on all five counts of the indictment and the district court sentenced him to 226 months of confinement, three years of supervised release, a $2,000 fine, and a $500 special assessment. Jennings appeals his convictions for possession of a firearm in relation to a crime of violence and attempted interference with interstate commerce by extortion.

## II.

Jennings first contends that the indictment count for carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), failed to charge an offense because the predicate act of possessing an unregistered pipe bomb does not constitute a "crime of violence." We

review the sufficiency of an indictment *de novo*. *See United States v. Cabrera-Teran*, 168 F. 3d 141, 143 (5th Cir. 1999). Since the issue of whether a crime constitutes a "crime of violence" is a matter of statutory interpretation, we review this decision *de novo* as well. *See United States v. Credit*, 95 F.3d 362, 364 (5th Cir. 1996).

18 U.S.C. § 924(c)(3) provides that:

the term "crime of violence" means an offense that is a felony and ) )

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another; or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). The government concedes that the first definition does not apply here, so our only inquiry is whether the possession of an unregistered pipe bomb is an offense that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.*

In conducting this inquiry, we do not consider any facts specific to Jennings's case. Using a categorical approach, we ask whether the inherent nature of the offense, possession of an unregistered pipe bomb, is a "crime of violence." *See, e.g., United States v. Delgado-Enriquez*, No. 98-51003, 1999 WL 705141, at *1, *2 (5th Cir. Sept. 10, 1999) ("[T]he phrase 'by its nature' requires courts to determine whether an offense constitutes a crime of violence without examining the underlying facts surrounding the conviction."); *United States v. Velazquez-Overa*, 100 F.3d 418, 420-21 (5th Cir. 1996) ("[E]ither a crime is violent 'by its nature' or it is not.").

Contrary to appellant's argument, however, to qualify as a "crime of violence" an offense need not actually involve violence. Rather, "the statute requires merely that the predicate crime create a

-4-

substantial risk of the possible use of force." *United States v. Greer*, 939 F.2d 1076, 1099 (5th Cir. 1991) (holding that conspiracy to violate another's civil rights is a crime of violence); *see also United States v. Galvan-Rodriguez*, 169 F.3d 217, 219 (5th Cir.) (per curiam) (holding that the unauthorized use of a vehicle was a "crime of violence"), *cert. denied* __ U.S. __, __ S. Ct. __, __ L. Ed. 2d __, 1999 WL 350495 (Oct. 4, 1999); *United States v. Rodriguez-Guzman*, 56 F.3d 18, 20 (5th Cir. 1995) ("A substantial risk that an event may occur does not mean that it must occur in every instance; rather, a substantial risk requires only a strong probability that the event, in this case the application of physical force during the commission of the crime, will occur.")  Therefore, if a felony involves a strong possibility of violence or property damage, regardless of whether it is an inchoate or completed crime, it is a "crime of violence" for purposes of 18 U.S.C. § 924(a).

We hold that possession of an unregistered pipe bomb, by its very nature, creates a substantial risk of violence.  Unlike a handgun, it is not considered sport to hunt or engage in target practice with a pipe bomb.[1]  Moreover, it would be quite difficult to protect oneself or one's family with a pipe bomb.  In fact, we cannot conceive of any non-violent or lawful uses for a pipe bomb.[2] *See United*

---

[1]  We thus distinguish the line of cases, cited by Jennings, where courts have held that mere possession of a handgun by a felon is insufficient to qualify as a crime of violence.  *See, e.g., United States v. Flennory*, 145 F.3d 1264, 1268 (11th Cir. 1998); *United States v. Canon*, 993 F.2d 1439, 1441 (9th Cir. 1993); *United States v. Chapple*, 942 F.2d 439, 441 (7th Cir. 1991).  We agree with the First Circuit's statement that there is a "reasonable)) indeed, very substantial)) difference between possession of a generic 'firearm' and possession of one of the specialized weapons singled-out for particularized treatment by 26 U.S.C. §§ 5845(a) and 5861(d)." *United States v. Fortes*, 133 F.3d 157, 162-64 (1st Cir.), *modified by* 141 F.3d 1 (1st Cir. 1998); *cf. United States v. Romero*, 122 F.3d 1334, 1341 (10th Cir. 1997) (finding possession of a handgun in prison to be a "crime of violence" because "we fail to discover a similarly 'innocent' purpose behind the possession of a deadly weapon by a prison inmate.").

[2]  At oral argument, when asked for an example of a non-violent, non-criminal use for a pipe bomb, counsel for Jennings could only suggest "blowing up something on your own property." We cannot agree that this is a feasible use for a weapon as imprecise and dangerous as a pipe bomb.

*States v. Dodge,* 846 F. Supp. 181, 184 (D. Conn. 1994) ("Pipe bombs are inherently dangerous weapons for which no peaceful purpose can be considered, regardless of whether the weapons are actually used."); *see also United States v. Dempsey,* 957 F.2d 831, 834 (11th Cir. 1992) ("[U]nlike firearms which may be used for sports, recreation or for collection, pipe bombs have no legitimate purpose and have the potential to kill indiscriminately, without warning, and with less chance that the perpetrator will be caught.") (citing *United States v. Loveday*, 922 F.2d 1411 (9th Cir. 1991)); *United States v. Newman*, No. 97-1294, 1997 WL 603740, at *1, *1 (10th Cir. Oct.1, 1997) (unpublished) (holding possession of pipe bombs to be a "crime of violence") (citing *Dodge*); *United States v. Cole*, No. 93-1344, 1994 WL 64697, at *1, *3 (6th Cir. 1994) (unpublished) ("Pipe bombs are inherently dangerous and serve no useful purpose."). Accordingly, there is a "substantial risk" that possession of this inherently dangerous weapon would produce violence or property damage. *See Cole,* 1994 WL 64697, at *5 (discussing "the unique dangers of pipe bombs) ) they are homemade, unstable, capable of damaging numerous people, have no legitimate purpose, and may be employed in a manner that avoids apprehension"); *cf. United States v. Drapeau*, 188 F.3d 987, 990 & n.4 (8th Cir. 1999) ("The offense of unlawfully making a bomb, however, focuses on the inherent dangerousness of, and lack of a legitimate purpose for, the bomb itself.").

We are guided to this conclusion by the language of the statute prohibiting the possession of an unregistered pipe bomb. *See Taylor v. United States*, 495 U.S. 575, 600, 110 S. Ct. 2143, 2158, __ L. Ed. 2d __ (1990) (looking to the statutory definition of a crime to determine whether it is a "crime of violence"). 26 U.S.C. § 5861(d) criminalizes possession of an unregistered "firearm." For purposes of the statute, "firearm" is not defined broadly to include all weapons; rather, it is narrowly circumscribed to forbid the unregistered possession of specific types of guns and other destructive

devices. *See id.* (referring to the definition of "firearm" at 26 U.S.C. § 5845 (1986)).[3] Several of our

sister circuits have pointed out the consequence of this specific definition, describing that:

> Not all firearms must be registered under 26 U.S.C. § 5861(d). Only those firearms must be registered that Congress has found to be inherently dangerous and generally lacking usefulness, except for violent and criminal purposes, such as sawed-off shotguns and hand-grenades.

*United States v. Fortes*, 141 F.3d 1, 6 (1ˢᵗ Cir.), *cert. denied* __ U.S. __, 118 S. Ct. 2387, 141 L. Ed.

2d 752 (1998) (holding possession of a sawed-off shotgun to be a "violent felony" for sentencing

purposes) (citing *United States v. Dunn*, 946 F.2d 615, 621 (9ᵗʰ Cir. 1991).

As this analysis implies, the primary reason that unregistered possession of these particular

weapons is a crime is the virtual inevitability that such possession will result in violence.[4]

Accordingly, as possession of a pipe bomb is a "crime of violence," Jennings's was properly convicted

of possession of a firearm (his .38 revolver) in relation to this "crime of violence."

### III.

Jennings next asserts that the district court erred in allowing his conviction under the Hobbs

---

[3]   The types of weapons included in the § 5845 definition of "firearm" include: short-barreled ("sawed-off") or otherwise modified shotguns, short-barreled rifles, modified rifles, machine guns, silencers, bombs, grenades, powerful rockets and missiles, mines, other powerful explosives, and specialized weapons "from which a shot can be discharged through the energy of an explosive." 26 U.S.C. § 5845.

[4]   Congress added bombs to the list of weapons for which unregistered possession was a crime in 1968. Congress expanded the scope of the National Firearms Act in this manner because of its "specific declaration and finding that destructive devices (such as bazookas, mortars, antitank guns, bombs, missiles, etc.,) machine guns, short-barreled shotguns, and short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection." *See* S. REP. No. 90-1501, at 28 (1968).

Act, 18 U.S.C. § 1951 (1994)[5], merely upon a finding that his conduct "affected" interstate commerce. Under the rationale of *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, __ L. Ed. 2d __ (1995), Jennings argues that he can only be constitutionally convicted of such a crime if his conduct "substantially affected" interstate commerce. *See id* at 559, 115 S. Ct. at 1630, __ L. Ed. 2d at __ (holding the Gun-Free School Zone Act unconstitutional as outside Congress's power under the Commerce Clause). Jennings argues that his Hobbs Act conviction should be reversed because (1) the Hobbs Act cannot constitutionally be applied to his single act of attempted extortion against a business, (2) the jury instructions improperly instructed the jury to convict upon finding beyond a reasonable doubt that his conduct "affected" commerce, and (3) there was insufficient evidence of a Hobbs Act violation because his conduct would not have "significantly affected" interstate commerce.

First, we address Jennings's argument that the Hobbs Act cannot constitutionally be applied to his single act of attempted extortion against a business. We review constitutional challenges *de novo*. *See United States v. Rose*, 153 F.3d 208, 209 (5th Cir. 1998).

Jennings's constitutional challenge is foreclosed by our decision in *United States v. Robinson*,

---

[5]  The Hobbs Act provides, in pertinent part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

119 F. 3d 1205 (5ᵗʰ Cir. 1997), *cert. denied* __ U.S. __, 118 S. Ct. 1104, 140 L. Ed. 2d 159 (1998).[6]

As here, in *Robinson* we were faced with the argument that after *Lopez*, convictions under the Hobbs Act are unconstitutional unless the government proved that the defendant's conduct "substantially affected" interstate commerce. We rejected that argument, holding that:

> [I]n Hobbs Act prosecutions based on local activities that affect interstate commerce, the government need not prove that the effect of an individual defendant's conduct was substantial. It suffices to show a slight effect in each case, provided that the defendant's conduct is of a general type which, viewed in the aggregate, affects interstate commerce substantially.

*Id.* at 1208. We subsequently explained this analysis to allow a Hobbs Act conviction for activity having a "*de minimus* nexus to interstate commerce, provided that the statute regulates an activity which, through repetition, in aggregate has a substantial effect on interstate commerce." *United States v. Miles*, 122 F.3d 235, 241 (5ᵗʰ Cir. 1997) (citing *Robinson*).

Accordingly, under the "aggregation" principle, the interstate commerce nexus is sufficient to uphold a Hobbs Act conviction if Jennings's actions are of a type that, repeated many times over, would have a "substantial effect" on interstate commerce. *See Robinson*, 119 F.3d at 1208; *United States v. Hebert*, 131 F.3d 514, 523 (5ᵗʰ Cir. 1997) (holding that federal jurisdiction exists if "the disruptions to interstate commerce caused by the robberies, if repeated at retail stores across the nation, would amount to a substantial effect on interstate commerce") (citations and internal quotations omitted); *Miles*, 122 F.3d at 236-37; *cf. Wickard v. Filburn*, 317 U.S. 111, 125, 63 S. Ct. 82, 89, 87 L. Ed. 122 (1942) (finding federal regulation of a single farmer's sale of wheat constitutional because wheat sales, when considered in the aggregate, have substantial effects on

---

[6]     In Jennings's brief and at oral argument, counsel for Jennings admitted that her Hobbs Act argument was foreclosed by Fifth Circuit precedent and asserted that the issue was presented in the briefs only for possible *en banc* or Supreme Court review.

interstate commerce).

We hold that attempted extortion of a business, repeated many times throughout the country, would have a substantial effect on interstate commerce. The fact that Jennings was only convicted of attempt to obstruct interstate commerce rather than actual obstruction is incidental. In calculating the impact of his actions for interstate commerce purposes, we assume Jennings completed his goals. *See United States v. Kaplan*, 171 F.3d 1351, 1354 (11th Cir. 1999) (en banc) ("Where attempted extortion or conspiracy to extort are charged, the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce . . .."); *see also United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996) ("[T]he jurisdictional requirement is satisfied by proof of a probable of potential impact.") (citation and internal quotation omitted); *United States v. Stillo*, 57 F.3d 553, 558 (7th Cir. 1995) (accepting evidence of attempted bribery as sufficient to support a Hobbs Act conviction because "[p]ayment of the bribe . . . would have the potential to affect the firm's ability to purchase goods in interstate commerce.")

We next consider Jennings's argument that the district court erred in instructing the jury. Jennings argues that the jury should have been required to find a "substantial effect" on interstate commerce to convict him, rather than being instructed to convict based on merely "an effect." Challenges to jury instructions are reviewed to determine whether the court's charge, as a whole, is a correct statement of the law and clearly instructs jurors on the legal principles at issue. *See United States v. Moreno*, 185 F. 3d 465, 476 (5th Cir. 1999).

This argument, too, was rejected in *Robinson*, where we called this post-*Lopez* theory "simple and rather elegant . . . [but] wrong." *Robinson*, 119 F.3d at 1214; *see also Hebert*, 131 F.3d at 523; *Miles*, 122 F.3d at 239-240 (accepting a similar jury instruction) (citing *United States v. Parker*, 104

F.3d 72 (5th Cir.) (en banc), *cert. denied* __ U.S. __, 117 S. Ct. 1720, 137 L. Ed. 842 (1997). Accordingly, the district court did not err in this regard.

Finally, we consider Jennings's contention that there was insufficient evidence to convict him of interference with interstate commerce. Challenges to evidentiary sufficiency are reviewed in the light most favorable to the verdict, inquiring only whether a rational juror could have found each element of the crime proven beyond a reasonable doubt. *See United States v. Nutall*, 180 F.3d 182, 185 (5th Cir. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). The critical element of a Hobbs Act conviction is interference with interstate commerce. *See Stirone v. United States,* 361 U.S. 212, 218, 80 S. Ct. 270, 274, 4 L. Ed. 2d 252 (1960) ("The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference."); *Robinson*, 119 F.3d at 1212. Accordingly, the evidence was sufficient on this element if a rational juror could have found beyond a reasonable doubt that Jennings interfered with interstate commerce.

Jennings planned to remove Dr. Gardner, her assistants, and her patients from the office. Jennings also planned to call other patients who had appointments later in the day to postpone or cancel their appointments. It is unclear from the record how long Jennings anticipated holding his targets hostage, but he did contemplate the activity taking a substantial amount of time. Further, Jennings contemplated killing any hostages who gave him a problem, and expressly authorized his co-conspirators (who all happened to be undercover law enforcement officials) to do the same.

The government asserts that the crime, if completed, would have obstructed Dr. Gardner's office from purchasing goods in interstate commerce. Under the "depletion of assets" doctrine developed in past cases, the government asserts, this showing is sufficient to uphold a Hobbs Act

conviction. *See Robinson*, 119 F.3d at 1212; *Hebert*, 131 F.3d at 523, *Miles*, 122 F.3d at 236-37.

The record indicates that Dr. Gardner's office purchased a substantial amount of its supplies from out-of-state. While the government did not prove that Jennings's scheme would have, if successful, impaired the office from purchasing supplies in the future, it need not make such a showing. We infer such obstruction in interstate commerce from a showing that the business "regularly buys goods from out of state." *Hebert*, 131 F.3d at 523 & n.8; *see also Miles*, 122 F.3d at 236-37; *United States v. Collins*, 40 F.3d 95, 99 (5th Cir. 1994) ("Depletion of the resources of the business . . . permits the reasonable inference that its operations are obstructed or delayed.") (citation omitted); *Robinson*, 119 F.3d at 1214-17. The government need not "show that any particular shipment of merchandise was obstructed or delayed . . . or that the business actually purchased fewer goods because of the [crime]") ) it need only prove that the target business engaged in interstate commerce. *Hebert*, 131 F.3d at 523 n.8. Given this precedent, we find the evidence that Jennings interfered with interstate commerce more than sufficient.

We acknowledge that the "asset depletion" theory asserted in *Robinson*, *Miles*, and *Hebert*, is not identical to the case at bar. Those cases involved Hobbs Act convictions for the actual theft of money from businesses, money which we inferred would have been used to purchase supplies from out of state. *See Robinson*, 119 F.3d at 1215; *Miles*, 122 F.3d at 236-37; *Hebert*, 131 F.3d at 523-4. Therefore, we asserted, the link with interstate commerce was sufficient because the depletion of funds from these businesses presumptively decreased interstate purchases. *See Robinson*, 119 F.3d at 1215; *Miles*, 122 F.3d at 236-37; *Hebert*, 131 F.3d at 523-24.

The interstate commerce nexus here is slightly more attenuated. The "asset" that would have

been "depleted" had Jennings succeeded was not cash on hand but Dr. Gardner and her assistants.[7]

However, this distinction is insignificant. The absence of Dr. Gardner and the postponement or cancellation of appointments undoubtedly would have produced diminished funds in the office register and consequently curtailed interstate purchases. *Cf. United States v. Arena*, 180 F.3d 380, 390 (2d Cir. 1999) (holding nexus sufficient because abortion "facilities would normally use supplies of out-of-state origin during medical visits by the patients whose appointments were canceled or who refused to return").[8] If stealing money from the office coffers would have "obstructed interstate commerce" because of the office's diminished interstate purchasing power, removing the method by which those coffers would be filled surely has the same effect.

We recognize that approval of *Robinson* and its progeny has not been unanimous.[9] However, until reconsidered by an *en banc* panel of this Court or by the Supreme Court, it is the law we are

---

[7] There is no specific evidence in the record to indicate, nor does the government argue, that Jennings planned to steal the cash or supplies from Dr. Gardner's office. Therefore, we assume for purposes of this argument that the only "asset" that would have been depleted had Jennings been successful was the removal of the dental staff from the office.

[8] This case is distinguishable from *United States v. Collins*, 40 F.3d 95 (5th Cir. 1994). In *Collins*, we rejected the government's argument that stealing a computer company employee's automobile and cellular phone and thereby preventing him from attending an important business meeting or conducting business was sufficient "asset depletion" to constitute an interference with interstate commerce. *Id.* at 99. This case, however, has a far more substantial nexus with interstate commerce. Had Jennings succeeded in his goal, he would not have merely prevented one individual from getting to work ) ) he would have completely shut down an entire business. *Cf. United States v. Harrington*, 108 F.3d 146, 1470 (D.C. Cir. 1997) (distinguishing *Collins* because while that case involved the robbery of an individual in his home, "[b]y contrast, the crime in which [defendant] participated was a robbery of a commercial entity which was itself engaged in interstate commerce").

[9] *See, e.g., United States v. Johnson,* 1999 WL 988249, at *1, *6 (5th Cir. Nov. 1, 1999) (Garwood, J., concurring); *Miles*, 122 F. 3d at 241-51 (DeMoss, J., concurring); *United States v. Hickman*, 179 F. 3d 230, 231 (5th Cir. 1999) (en banc) (Higginbotham, Jolly, Jones, Smith, Duhé, Barksdale, Emilio M. Garza, DeMoss, JJ., dissenting).

bound to follow and apply. *See Macktal v. United States Dep't of Labor*, 171 F.3d 323, 328 & n.4 (1999).

## IV.

Finding his contentions to be without merit, we AFFIRM Jennings's convictions.