**UNITED STATES of America**

**v.**

**George SLAUGHTER, Defendant.**

**No. 2:99CR10082.**

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

Aug. 29, 2000.

Eric M. Hurt, U.S. Atty.'s Office, Abingdon, VA, for Plaintiff.

Barry Lynn Proctor, Abingdon, VA, Joseph F. Hunnicutt, Adkins, Elkins & Hunnicutt, Norton, VA, for Defendant.

## OPINION AND ORDER

JONES, District Judge.

In this criminal case, I grant the defendant's post trial motion as to counts one and three of the indictment and enter a judgment of acquittal. As to counts two and five, the motion will be denied.

### I. Procedural Background.

On December 9, 1999, a grand jury of this court returned a five-count indictment against George Slaughter. Counts one and three charged Slaughter with knowingly threatening to use a weapon of mass destruction in violation of Title 18 U.S.C.A. § 2332a(a)(2) (West Supp.2000). Counts two, four, and five charged Slaughter with violating 18 U.S.C.A. § 876 (West 2000) by mailing threatening letters. At trial, on April 12, 2000, a jury returned a verdict of guilty on counts one, two, three, and five.[1]

Thereafter, the defendant filed a motion to set aside the jury's verdict[2] on the grounds that the threat involved in count one was not perceived as a true threat by its recipient; that there was insufficient evidence that the threat to use a weapon of mass destruction would have affected interstate commerce (counts one and three); that there was insufficient evidence that Slaughter deposited the threatening letters in the mail (counts two and five); and

that the threat involved in count three was not addressed to a person as required by the statute.

The parties were given an opportunity to present written argument to the court, and the motion is ripe for decision.

### II. Facts Presented at Trial.

S. Catherine Dodson is a deputy state prosecutor in Norfolk, Virginia. In 1997, she was a supervisor in charge of the violent crime team, and in that capacity, she successfully prosecuted George Slaughter. Slaughter was sentenced to a lengthy state prison term.

On September 7, 1999, a letter for Dodson from Slaughter arrived at Dodson's office via the United States mail. The envelope was addressed to Catherine Dodson, had the return address of G.R. Slaughter at Red Onion State Prison, in Pound, Virginia, and was postmarked Bristol, TN/VA. (Government's Ex. 1.)

The letter itself was addressed to S. Catherine Dodson and signed by G.R. Slaughter. The letter stated that in the coming months, Slaughter would contact Dodson with instructions, and that if she failed to follow the instructions, members of her family would be killed. The letter also expressed, among other things, that Dodson would be killed if she went to the police and that Slaughter had found out the names and addresses of her family members. Dodson notified her boss, who in turn notified the police and the state department of corrections about the letter.

On October 18, 1999, Dodson received another letter at her office with Slaughter's return address via the United States mail. Dodson had been instructed to wait until an agent of the department of corrections arrived before opening the letter. The unopened letter was put in a transparency cover. The next day, department of

---

1. A judgment of acquittal on count four was entered at trial when the government conceded that the facts proved were insufficient to support a conviction.

2. There is no motion to set aside the verdict denominated as such by the rules. However, I will construe the motion as one for judgment of acquittal. *See* Fed.R.Crim.P. 29.

corrections special agent James Leslie arrived and opened the letter. The envelope was addressed to S. Catherine Dodson, the return address was George Slaughter at Red Onion State Prison, and the postmark was Bristol TN/VA. Inside the envelope was a white powder. Agent Leslie smelled the white powder, then transferred it to a plastic envelope container.

The letter indicated that Slaughter wanted Dodson dead, even if it cost him his life. The letter claimed that the white powder was anthrax, stating, "guess what I got over the fence? I got enough [a]nthrax to kill you with, [a]nd it can be done by mail. That powder you just dumped out of this letter is enough to kill at least 50,000 people. You'll think you have the flu tomorrow and the next day you'll be dead." (Government's Ex. 4.) At the end of the letter, the writer threatened that if he were ever released, he would dig up Dodson's grave and violate her corpse. The letter was signed George R. Slaughter.

Agent Leslie testified that he was "a little nervous" after the letter was read. (Tr. at 27.) None of the people present contacted the police or emergency medical help, and Leslie did not contact a doctor. The next day, Leslie took the powdery substance to a lab, and it was determined that the substance was not anthrax and was nontoxic.

Also in October, a third letter was sent through the United States mail to the Kentucky Educational Television station in Lexington, Kentucky. The envelope was addressed to 600 Cooper Drive, Lexington, Kentucky. The return address had Slaughter's name and address at Red Onion State Prison. The letter inside read:

Hello!

I just wanted you to know that you just opened a letter which contains enough [a]nthrax to kill over 50,000 people. You have a nice day[ ]!

(Government's Ex. 6.)

A mail room employee opened the letter because the envelope was not addressed to a specific person. A substance that looked like chalk dust spilled onto the counter. The employee brought the letter to his supervisor's attention. The mail room supervisor notified the postal inspector, who then notified the Federal Bureau of Investigation. The five people who had been near the letter were quarantined and no one was allowed to leave or enter the building. A variety of local fire trucks, police cars, and disaster and emergency response teams responded. After about five hours, the quarantine ended.

At trial, Leanne McCoy, the mailroom supervisor for Red Onion State Prison, testified that prisoners can send mail by handing it to a floor officer, who in turn takes it to an office until the afternoon mailbags come in. Alternatively, prisoners can put it into an outside mailbox on the way to the "chow hall." The outgoing mail is then put into mail bags and sent to the mail room. McCoy testified that the envelopes that carried the letters to Dodson bore the Red Onion State Prison disclaimer on the back. It is the prison's policy that the disclaimer is stamped onto all outgoing mail. McCoy also testified that all three envelopes were postmarked by the Bristol, Tennessee and Virginia, post office which handles the Red Onion State Prison mail.[3]

The government also offered the testimony of Lieutenant Colonel John Rowe, M.D., an officer in the Army Medical Corps and an expert regarding anthrax. Col. Rowe described the manner in which anthrax infected humans, the effects of infection including mortality rates, and the ways anthrax can be manufactured. He also testified that in one case, the release of a gram of anthrax resulted in at least

**3.** The adjacent cities of Bristol, Virginia, and Bristol, Tennessee, are served by one post office.

seventy-nine cases of inhalational anthrax, and that if the amount it took to fill a five-pound bag of sugar was disseminated efficiently, it would be enough to kill a million people. When asked about the effect of an amount that would fill up a regular envelope used for mail, Col. Rowe stated, "[i]t could certainly kill somebody if they opened it up and aerosolized any of that powder. Because the amount that would be aerosolized verses the amount that would be inhaled, it would be easy to inhale [a lethal dose.]" (Tr. at 92–93.)

Finally, Col. Rowe also testified that if anthrax was used as a weapon, his agency would respond "in several different modalities." (Tr. at 88.) He stated that, "[w]e would probably do the lab analysis on it for one thing, and then we would also send our physicians and other microbiologists out to respond to that." The scientists would be deployed from Fort Detrick in Maryland. In addition, a specialized team from the FBI would respond, including "some people" from an Army unit in Aberdeen, Maryland. (Tr. at 89.)

The government also presented the testimony of FBI special agent Tom Snapp, who interviewed Slaughter in prison after the letters had been received. He testified that Slaughter had admitted writing threatening letters to Dodson in order "[t]o scare her." (Tr. at 96.)[4]

### III. Sufficiency of the Evidence as to Interstate Commerce.

In counts one and three, Slaughter was charged with violating 18 U.S.C.A. § 2332a(a)(2). That statute, in relevant part, states that a person who "without lawful authority, ... threatens ... to use, a weapon of mass destruction ... against any person within the United States, and the results of such ... threat ... would have affected interstate or foreign com-

merce ..." shall be guilty of a crime against the United States.[5]

Slaughter argues that the evidence that the government presented at trial was insufficient for a jury to find an effect on interstate or foreign commerce. In ruling on the motion, I must "allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982).

■ Where Congress has written a statute to include an effect on interstate or foreign commerce as an element of the offense, it is necessary to perform a case-by-case analysis to determine whether the jurisdictional element is satisfied. *See United States v. Spinello,* 95 F.Supp.2d 242, 245 n. 5 (D.N.J.2000). Because the statute here includes such a jurisdictional element, the government need only show a minimal effect on interstate commerce. *See United States v. Farrish,* 122 F.3d 146, 148–49 (2d Cir.1997).

■ However, in light of our federal system, "the government still must show that an effect on interstate commerce is reasonably probable." *United States v. Buffey,* 899 F.2d 1402, 1404 (4th Cir.1990). The Supreme Court has recently noted that the "regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000). In order for Congress to have regulatory power, where a statute targets noneconomic, violent criminal conduct, the conduct must have more than an aggregate effect on interstate commerce. *See*

---

4. The government offered the testimony of a fingerprint technician who had identified a fingerprint found on one of the letters, but I sustained the defendant's objection to any attribution of this identified fingerprint to Slaughter since the government had no non-hearsay evidence in that regard. (Tr. at 67.)

5. A biological weapon is deemed by the statute to be a "weapon of mass destruction," *see* 18 U.S.C.A. § 2332a(c)(2)(C) (West Supp. 2000), and the evidence established that anthrax is such a weapon.

*id.* The government must provide proof that each act prosecuted would have at least a minimal effect on interstate commerce. Thus, in this case, in order to sustain the jury's verdict, the government must have provided sufficient evidence for a jury to conclude that had Slaughter's threat been carried out, interstate commerce would have been affected.

The testimony at trial from Col. Rowe established that if the amount of anthrax in an envelope-sized container was released, it would be enough to "kill somebody." (Tr. at 93.) Col. Rowe also testified about the effects of a larger amount of anthrax. In addition, he stated that several military doctors and scientists would travel from Maryland to Virginia had the threatened use of anthrax been carried out.

█ In count one, the letter sent to Dodson, there was no evidence that the threatened use of anthrax would have affected a "tangible component of interstate commerce." *United States v. Viscome,* 144 F.3d 1365, 1369 (11th Cir.1998) (holding that the attempted bombing of a truck that was the subject of an interstate lease had the requisite effect on interstate commerce). Dodson is a state prosecutor, and the threatened use of a weapon of mass destruction was against her and some of her colleagues, not against a store, bank, leased vehicle, or other obvious component of interstate commerce. Slaughter's threat to Dodson would not have affected interstate commerce directly.

Similarly, there was no evidence that the use of anthrax threatened against the Kentucky Educational Television station would have affected a component of interstate commerce. No evidence was presented that the television station bought or sold interstate goods, broadcast to an interstate area, or had any other effect on interstate commerce. Thus, there was no evidence

that the threatened use of anthrax had a direct effect on interstate commerce.[6]

The government may satisfy a statutory jurisdictional component indirectly if it presents evidence of "a reasonable probability that the defendant['s] actions would have the effect of depleting the assets of an entity engaged in interstate commerce." *Buffey,* 899 F.2d at 1404. There is no evidence that the threatened uses of anthrax here would have affected interstate commerce under such a "depletion of assets" theory. *See United States v. Guerra,* 164 F.3d 1358, 1361 (11th Cir.1999). The government did not introduce evidence that either Dodson or the television station lost any money due to the threats, nor that they engaged in interstate commerce.

█ The only evidence offered to show that the threatened use of anthrax would have affected interstate commerce was that an unspecified number of military doctors and scientists would have responded. The entire evidence in this regard, from Col. Rowe's testimony, is as follows:

Q And in the event that actually anthrax were to be, say, discovered and be used as a weapon, would your agency respond?

A Yes. We would probably respond in several different modalities. We would probably do the lab analysis on it for one thing, and then we would also send our physicians and other microbiologists out to respond to that.

Q Where would these different representatives from your agency come from location wise? What state?

A From Maryland, from Fort Detrick.

Q And does the FBI, to your knowledge, also have a response team for weapons of mass destruction?

A Domestic Emergency Support Team from the FBI would respond, and

---

**6.** The fact that the letters were mailed, and that one of them traveled from Virginia to another state, is of no moment, since the statute requires that the results of the threat would have affected interstate commerce, and not that the threat merely be communicated through interstate commerce.

that would include some people from the Army's unit up in Aberdeen, Maryland.

(Tr. at 88–89.)

The Fourth Circuit has held that an effect upon interstate commerce can be established by proof of probabilities. *See United States v. Brantley*, 777 F.2d 159, 162 (4th Cir.1985). That is, the government does not have to prove that identifiable transactions in interstate commerce would be affected, but that there is a probability or likelihood of such an effect. *See id.* For example, in *United States v. Jennings*, 195 F.3d 795, 801–02 (5th Cir.1999), the government satisfied its burden by proving that if the defendant had succeeded in his plan to hold a doctor and her staff at a remote location for ransom, the cancellation of appointments would have meant less revenue. Because the government had proven that the office regularly bought goods from out of state, the government had proven a probable effect on interstate commerce. It was unnecessary to show that any particular shipment of goods was delayed. *See id.*

In this case, however, there was no evidence as to what probable effect the military personnel would have had on interstate commerce. The government did not introduce evidence that the military personnel would have had to bring or use supplies that had traveled in interstate commerce, or that they would have traveled in commercial carriers, lodged in hotels, or eaten at restaurants that engage in interstate commerce.

Federal criminal jurisdiction would be largely unrestrained if it were established under the facts of this case. If travel by a federal government employee to investigate possible criminal conduct alone established federal jurisdiction, then federal agencies would themselves control whether such jurisdiction existed.

It is possible that the use of a weapon of mass destruction, unlike other crimes, would be of such magnitude that every instance would require the response of specially trained government agents being dispatched across state lines to address the problem. In that case, the effect on interstate commerce caused by the agents' emergency travel would be a more direct result of the criminal activity than a federal agent that crossed state lines merely to investigate a crime. However, there was no evidence to indicate that the dispatch of the military units described by Col. Rowe would be a necessary result of the use of anthrax, or to demonstrate why these military units would travel to the scene of an anthrax infection.

Under this limited set of facts, there is insufficient evidence that the threatened use of anthrax would have affected interstate commerce to support a conviction under counts one and three.[7] Accordingly, I will set aside the verdict as to those counts and enter a judgment of acquittal.

*IV. Sufficiency of the Evidence as to Mailing Threatening Letters.*

■ As to counts two and five, the defendant argues that the verdict of guilty was not supported by the evidence. Specifically, he argues that there is no post office or authorized depository located at the prison where he was being held, and that he was not permitted to travel to the post office. In addition, he argues that no one saw him deliver the letters to the mailroom, and that impermissible speculation was required by the jury to find that he had mailed the letters. I find these arguments unconvincing.

It is "well established that proof of mailing and causing mailing may be made by circumstantial evidence." *United States v. Ring*, 513 F.2d 1001, 1010 (6th Cir.1975). Here, a prison employee described for the jury the procedure by which prisoners at Red Onion State Prison caused letters to be mailed. The evidence also showed that the envelopes received had Slaughter's name and prisoner number in the return

---

**7.** Because I find that the evidence was insufficient as to the interstate commerce element of the offense, I do not reach the defendant's other arguments as to those counts.

address area, that two of the letters were stamped with the Red Onion State Prison disclaimer, and that the letters were sent around the same time and had similar handwriting. Finally, Slaughter admitted to an FBI agent that he had written threatening letters to Dodson. Based on this evidence, a reasonable jury could have inferred that Slaughter caused the mailing of the letters. *See id.*

### V. Conclusion.

For the foregoing reasons, it is **ADJUDGED AND ORDERED** that a judgment of acquittal is entered as to counts one and three of the indictment and otherwise the defendant's motion is denied.