# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-2633

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

THOMAS P. CARROLL,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 195—**Blanche M. Manning**, *Judge.*

———————

ARGUED MARCH 31, 2003—DECIDED OCTOBER 7, 2003

———————

Before BAUER, RIPPLE, and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-Appellant Thomas P. Carroll challenges the district court's offense-level calculations under the United States Sentencing Guidelines and resulting sentence of 262 months' incarceration for his admitted involvement in an immigration visa fraud operation while employed in Guyana as a United States foreign service officer. For the reasons set forth below, we vacate Carroll's sentence and remand the case to the district court with instructions to sentence Carroll in a manner consistent with this opinion.

## BACKGROUND

Prior to his arrest in March 2000, Carroll, a United States citizen, served as a foreign service officer with the United States Department of State. As a vice-counsel in the United States Embassy in Georgetown, Guyana, from March 1998 until his arrest, he had discretionary authority to issue non-immigrant United States visas.[1] In abuse of this capacity, he coordinated the illegal sale of hundreds of fraudulent visas through local brokers with whom he shared an average of $10,000 in bribe proceeds per visa. One such broker was Guyanese citizen Halim Khan, upon whom Carroll also relied to assist in the laundering of illicit profits. Though many fraudulent (and perhaps even some legitimate) visa applications were supported by forged documents (supplied by Khan), Carroll nonetheless insisted that all visa applicants, both legitimate and fraudulent, undergo mandatory background security checks.[2] Because the visa scheme involved large amounts of cash and attracted the interest of Guyanese citizens desperate to reach the United States, Carroll directed corrupt Guyanese police to intimidate anyone posing a threat to the operation or his security.

Consequent to a routine reassignment of duties in March 1999, Benedict Wolf replaced Carroll at the non-immigrant visa desk. Carroll, who remained at the embassy

---

[1] A non-immigrant visa permits an alien to visit the United States for a limited time period on the condition that the alien will depart no later than the date of its expiration.

[2] We can only speculate as to whether Carroll's insistence on this point was made owing to some atrophied sense of moral accountability that subsisted improbably along the periphery of Carroll's depravity and greed or, more likely, in order to avoid the scheme's detection as a result of subsequent similar checks conducted by immigration authorities.

in Guyana on a different assignment, took advantage of Wolf's one-week absence in August 1999 to issue up to 50 additional illegal visas. Carroll later recruited Wolf to issue 250 illegal visas to Kahn's clients in exchange for $1,000,000. In so doing, Carroll played directly into the hands of law enforcement officials who, during the course of their ongoing investigation of Carroll's activities, had recruited Wolf to serve as an informant.

Carroll and Kahn were arrested in March 2000 and each was charged with (i) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; (ii) production and issuance of false United States visa documents, in violation of 18 U.S.C. § 1028; and (iii) bribery of a public official, in violation of 18 U.S.C. § 201. The indictment also alleged joint and several forfeiture to the United States of traceable illegal visa proceeds (pursuant to 18 U.S.C. § 982) or substitute assets (pursuant to 21 U.S.C. § 853) in the amount of $1,140,000.[3]

Meanwhile, back in the United States, Carroll engaged in a series of candid proffer sessions with an Assistant United States Attorney, during which he detailed his criminal activities and those of his associates. The proffer sessions preceded unsuccessful plea agreement negotiations, in which the United States approved a 57-month prison sentence recommendation but refused to recommend a downward departure for Carroll's substantial assistance, pursuant to U.S.S.G. § 5K1.1. Instead, on the advice of counsel, Carroll entered guilty pleas on all charges without the benefit of an agreement. He further conceded forfeiture liability in the amount of $2,500,000 (more than double the

---

[3] The internal investigation that followed Carroll's arrest caused a two-week disruption of consular operations at the embassy, though the issuance of emergency and diplomatic visas was unaffected.

amount included in the indictment), though he contested the forfeiture of six brokerage accounts named in the indictment. The district court then ordered a Presentence Investigation Report (PSR). Carroll explained to the probation officer preparing the PSR that his wife's premarital assets totaled $28,000 and that his legitimate savings, aggregated with his wife's assets, amounted to as much as $100,000, which he felt the government should exempt from forfeiture.

Revised to reflect various changes proposed by either party, the PSR calculated Carroll's total offense level to be 27, corresponding to a prison term ranging from 70 to 87 months for an offender with Carroll's criminal history. Both the United States and Carroll raised numerous objections to the PSR calculation and moved for departures from the U.S.S.G., and the district court held an extensive sentencing hearing. By Memorandum and Order dated June 13, 2002, the district court overruled Carroll's objections to the PSR, denied Carroll's motion for a downward departure, sustained the United States' objections to the PSR, and granted the United States' motions for an upward departure. Specifically, the district court ruled that (i) the Probation Department properly calculated the loss amount associated with Carroll's conduct to be between $5 million and $10 million; (ii) Carroll's statements during the plea colloquy and to the probation officer merited a 2-level enhancement for obstruction of justice despite the Probation Department's opposite conclusion; (iii) Carroll was not entitled to a 3-level reduction for acceptance of responsibility despite the Probation Department's opposite conclusion; (iv) it lacked discretion to grant a downward departure for substantial assistance absent a motion by the United States; and (v) upward departures were appropriate due to the loss of public confidence in the government, significant disruption of government functions, danger to the public welfare, and threats of violence and property damage asso-

ciated with Carroll's conduct. Based on these rulings, the district court calculated Carroll's total offense level to be 39 and sentenced him to 262 months of imprisonment to be followed by 3 years of supervised release.[4]

Carroll now challenges the district court's findings that he obstructed justice and that he did not accept responsibility for his actions, as well as its decision granting the United States' upward departure motions.

---

[4] The district court calculated Carroll's total offense level as follows:

| *Factor*: | | *Level & U.S.S.G. provision*: |
|---|---|---|
| Base Offense Level (Bribery) | 10 | (2C1.1(a)) |
| Specific Offense Characteristics | | |
| Involved multiple bribes | 2 | (2C1.1(b)(1)) |
| $5 million < loss amount < $10 million | 14 | (2C1.1(b)(2) (A) & 2F1.1) |
| Adjustments for | | |
| Organizer/Leader Role | 4 | (3.B1.1(a)) |
| Obstruction of Justice | 2 | (3C1.1) |
| Acceptance of Responsibility | 0 | (3E1.1(a)) |
| Downward Departures | | |
| Substantial Assistance | 0 | |
| Upward Departures | | |
| Loss of Public Confidence in Government | 2 | (2C1.1, Note 5) |
| Significant Disruption of Govt. Function | 1 | (5K2.7) |
| Danger to the Public Welfare | 2 | (2K2.14) |
| Use of Threats of Violence & Resulting Property Damage | 2 | (5K2.5) |
| **TOTAL OFFENSE LEVEL. . . . . . . . . . . . .39** | | |

**ANALYSIS**

The district court's application of the Sentencing Guide-lines is an issue of law, which we review de novo. We review the district court's findings of fact for clear error, and will reverse only those findings which, after our consideration of all of the evidence, leave us with the "definite and firm conviction that a mistake has been committed." *United States v. Irby*, 240 F.3d 597, 599 (7th Cir. 2001) (quoting *United States v. Messino*, 55 F.3d 1241, 1247 (7th Cir. 1995)). Finally, we review the district court's decision to de-part from the applicable sentencing guideline range for an abuse of discretion. *See United States v. Leahy*, 169 F.3d 433, 439 (7th Cir. 1999).

The district court found that "Carroll knowingly misled [it] and the Probation Department in an attempt to affect [its] forfeiture determination," for which reason it applied a two-level obstruction of justice enhancement pursuant to USSG § 3C1.1. *United States v. Carroll*, No. 00 CR 195-2, op. at 9 (N.D. Ill. June 13, 2002) (sentencing memorandum opinion and order). The court based this finding on Carroll's statements during the plea colloquy regarding the six bro-kerage accounts whose forfeiture he contested, as well as his statement to the probation officer that his legitimate assets, including his wife's premarital assets, amounted to as much as $100,000.

During the plea colloquy, the United States recited a long list of Carroll's assets which it determined to be derived from illegal visa proceeds and therefore subject to forfei-ture. Carroll entered a plea of guilty on the forfeiture al-legations. Carroll's counsel then indicated Carroll's admis-sion that these assets were tainted with illegal profits and thus subject to forfeiture, with the exception of six specific brokerage accounts. The district court then asked Carroll directly whether those six counts were exceptions, to which Carroll replied, "That's correct." Carroll offered no further

explanation for the exceptions, however, and the fact that none was solicited suggests to this Court—as it did to the probation officer conducting the presentence investigation—an understanding among the parties and the district court that Carroll would later clarify and qualify this position. In fact, the district court judge informed counsel that, given the "broad language in the indictment [,] at sentencing we can thrash that out, and you both can present whatever evidence you deem appropriate" with respect to the forfeiture allegation. Instead, Carroll clarified his position during an interview with the investigating probation officer by indicating that, although those six accounts contained tainted proceeds commingled with legitimate savings, he believed his wife's premarital assets, together with his *legitimate* savings within those accounts, amounted to as much as $100,000.

Application Notes 4(f) and 4(h) to U.S.S.G. § 3C1.1 list as examples of obstructive conduct "providing materially false information to a judge or magistrate" or to "a probation officer in respect to a presentence or other investigation for the court." Application Note 6 further defines "materiality" as follows: " 'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." Assuming, *arguendo*, that Carroll's statements to the district court and the investigating probation officer were *knowingly* inaccurate,[5] we find that they do not amount to material

---

[5]  The district court relied on evidence of Carroll's ordinarily "meticulous" management of his finances as proof of his deceptive intent during the plea colloquy and the presentence investigation. We are not similarly persuaded. Evidence of Carroll's historical financial vigilance does not obviate the fact that (i) his representations during the plea colloquy were merely undeveloped, preliminarily adopted legal positions and (ii) Carroll's statements to the probation officer were made (A) without the benefit of his having reviewed his financial records and (B) during his twentieth month

(continued...)

falsehoods within the meaning of U.S.S.G. § 3C1.1 and its Application Notes, insofar as they had no impact on his forfeiture liability. By pleading guilty to a $2.5 million forfeiture allegation where the United States had seized only $1.7 million in assets, it was of zero consequence whether the seized assets were legitimately or illicitly derived, in light of the provision in 21 U.S.C. § 853 for the forfeiture of substitute of assets in satisfaction of a forfeiture judgment. In other words, all of Carroll's property was subject to forfeiture regardless of its source.

In applying the obstruction enhancement, the district court relied on federal appellate decisions from other circuits affirming obstruction enhancements based on materially false statements where a defendant intentionally minimized and concealed assets, *see United States v. Anderson*, 68 F.3d 1050, 1056 (8th Cir. 1995), denied the existence of a bank account, *see United States v. Nelson*, 54 F.3d 1540, 1543-44 (10th Cir. 1995), or omitted a home which she had contracted to purchase from the "real estate" field of a financial disclosure form submitted to a probation officer, *see United States v. Smaw*, 993 F.2d 902, 903-04 (D.C. Cir. 1993). The district court reasoned that these cases stand for the proposition that misleading statements regarding a defendant's finances are material to the determination of the defendant's ability to pay fines and restitution.

The instant case is distinguishable in two respects. First, unlike the defendants in *Anderson*, *Nelson*, or *Smaw*, nowhere does the record reveal an attempt by Carroll to conceal assets. Overestimating the amount of legitimate assets commingled with illicit assets is a far cry from concealing

---

[5] (...continued)
in federal custody (notwithstanding the United States' argument that its production of his financial records during discovery afforded him access thereto).

the very existence of assets from investigators or the court.[6] Secondly, Carroll's ability to pay fines or restitution is not at issue here because the substitute forfeiture provision of 21 U.S.C. § 853 subjects Carroll's every last penny to forfeiture. Regardless of either the source of the funds in the six accounts or the exact amount of Carroll's legitimate assets, after the forfeiture of $2.5 million, he retains nothing with which he might pay fines or restitution.[7]

In short, any inaccuracies in Carroll's statements to the district court or the probation officer regarding his finances, whether made knowingly or not, were not material falsehoods within the meaning of U.S.S.G. § 3C1.1. The district court's application of a two-level enhancement for obstruction of justice was therefore improper.

Based in part on its finding that Carroll obstructed justice, the district court sustained the United States' objection to the Probation Department's recommendation of a three-level reduction, pursuant to U.S.S.G. § 3E1.1, for Carroll's acceptance of responsibility for his conduct. U.S.S.G. § 3E1.1 provides for a two-level reduction for a defendant who clearly demonstrates an acceptance of responsibility for his offense and an additional one-level reduction if the defendant timely provides complete information to the gov-

---

[6] Application Note 2 to U.S.S.G. § 3C1.1 contemplates precisely such a distinction: "In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." Considering the duration of Carroll's illegal conduct and the number of commingled accounts involved, confusion, mistake, and Carroll's faulty memory presumptively explain his inaccurate estimates of legitimate funds relative to illegitimate. The United States has the burden of proving Carroll's deceitful intent. It has not.

[7] Significantly, the district court did not order Carroll to pay any fine or restitution.

ernment regarding his involvement in the offense or timely notifies the prosecution of his intention to plead guilty, thereby conserving judicial and prosecutorial resources by avoiding a trial. In refusing to reduce Carroll's offense level for acceptance of responsibility, the court relied upon Application Note 4 to U.S.S.G. § 3E1.1, which provides that obstructive conduct resulting in an enhancement pursuant to U.S.S.G. § 3C1.1 "ordinarily indicates that a defendant has not accepted responsibility for his crime." *See also United States v. Ojo*, 916 F.2d 388, 393 (7th Cir. 1990). Because we find that Carroll did not obstruct justice within the meaning of U.S.S.G. § 3C1.1, however, Application Note 4 and *Ojo* are inapplicable to this case.

As alternative bases for its refusal to apply the acceptance of responsibility reductions, the district court found that Carroll attempted to (i) minimize his role in the visa scheme by providing during the plea colloquy "simply a general, bare-bones description of the visa scheme lacking in any detail [and] woefully lacking for purposes of a § 3E1.1 reduction," and (ii) rationalize his actions "by stating, without offering any proof, whatsoever, that Guyana is a very corrupt country and that the State Department employees were already involved in a 'pervasive visa scheme before Carroll arrived at his post.' " This court ordinarily defers to the district court's determination as to a defendant's acceptance of responsibility within the meaning of U.S.S.G. § 3E1.1. *See* Application Note 5. However, in considering whether Carroll accepted responsibility, the district court ignored the fact that Carroll engaged in numerous, intensive proffer sessions over a period of months, in which he described his illegal conduct in considerable detail.[8] Without the anchor of a valid obstruction of justice finding, the court's alternative reasons for finding that Carroll did not

---

[8] In fact, from the information obtained during just the first two proffer sessions, the United States produced a 19-page, single-spaced, remarkably detailed documentation of Carroll's own account of his conduct.

accept responsibility for his actions simply do not withstand the swell of cooperation Carroll provided in good faith to the United States during the proffer sessions. Significantly, Application Note 1(a) states that "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under [§3E1.1(a)]." Carroll's "bare-bones" description of his guilt set forth all of the elements of his offenses and constituted a full admission of his illegal conduct. Not only was Carroll's statement during the plea colloquy a sufficient basis for the two-level reduction, but also his proffer sessions far exceeded the minimum admission of responsibility for criminal conduct. Moreover, both the proffer sessions and his early indication of his intent to enter a guilty plea entitle him to the additional one-level reduction.[9] We therefore conclude that the district court's determination that Carroll did not demonstrate acceptance of responsibility is inconsistent with the evidence. The refusal to reduce his offense level pursuant to U.S.S.G. § 3E1.1 was clearly erroneous.

In reviewing the district court's decision to depart upward from the applicable sentencing guideline range, this Court considers the following three factors: (i) whether the grounds for the departure were appropriate; (ii) whether or not the district court's factual findings regarding the departure are clearly erroneous; and (iii) whether the extent of the resulting upward departure was reasonable. *Leahy*, 169 F.3d at 439. A finding of error based upon any one of these factors may constitute sufficient grounds for vacating the sentence. *See* 18 U.S.C. § 3742(f).

---

[9] That Carroll did not accept the prosecution's plea agreement, as the United States anticipated, but instead opted to enter a "blind" guilty plea, does not make him ineligible for the one-level reduction. Although his rejection of the agreement resulted in a lengthy sentencing hearing, he nonetheless permitted the United States to avoid preparing for trial.

Several facts direct our immediate attention to the issue of the reasonableness of the district court's resulting application of four upward departures, the third factor discussed in *Leahy.* First, just prior to Carroll's plea colloquy, the United States approved the plea agreement calling for a 57-month prison term. However, Carroll was dissatisfied with the government's refusal as part of the agreement to move for a downward departure for his substantial assistance. Disregarding the district court's warning that a blind guilty plea could result in a more severe sentence than that offered under the agreement, he opted to plead blindly on the advice of counsel. Secondly, based on a higher loss amount than that contemplated in the plea agreement, the Probation Department calculated a recommended offense level of 27, which would have resulted in a prison term ranging from 70 to 87 months. The significant increase from 57 months to a term ranging from 70 to 87 was a risk that Carroll knowingly assumed when entering a blind plea. Thirdly, during the plea colloquy and interviews with the presentence investigator, Carroll made inaccurate statements regarding his finances which, for the reasons explained above, neither obstructed the administration of justice nor contradicted his acceptance of responsibility for his conduct. Fourthly, between the time of his decision in April 2001 to reject the plea agreement and his sentencing in June 2002, neither the prosecution nor the court learned of additional aggravating factors that would constitute grounds for an upward departure.[10] Rather, all factual bases for the upward departures had come to light prior to the plea colloquy. Fifthly, fourteen months later, the prosecution sought—and the district court imposed— a prison sentence of 262 months, triple the maximum 87- month sentence recommended by the Probation Department. Sixthly and finally, Carroll's co-conspirator, Kahn,

---

[10] For instance, despite the suspicions of the investigators and prosecutors, no hidden assets were discovered subsequent to Carroll's guilty plea.

was sentenced several weeks later to a 38-month prison term under a plea agreement. While there are a number of reasons that Carroll might deserve a more severe sentence than Kahn, a disparity of this magnitude certainly goes a long way toward questioning the reasonableness of the upward departures. Absent some other intervening facts between the time of the prosecution's offer of a 57-month prison term and the district court's imposition of a 262-month prison term—and we know of none—this Court is at a loss to discern the reasonableness of such a draconian increase in Carroll's prison term.[11] Under these circumstances, we find that any upward departure from the applicable guideline range, even if made on appropriate grounds and adequately supported by factual findings, results in a final offense level and consequent sentence that unreasonably exceed the applicable guidelines and thus amount to an abuse of discretion. Rather, the final offense-level calculation of 27, which corresponds to a sentence ranging from 70 to 87 months' incarceration, adequately reflects the seriousness of and will provide a just punishment for Carroll's offenses, *see* 18 U.S.C. § 3553(a)(2)(a), and will avoid an unwarranted disparity between the sentences of Carroll and his co-conspirator, Kahn, *see* 18 U.S.C. § 3553(a)(6).

---

[11] During oral argument, the Assistant United States Attorney suggested that, had Carroll simply accepted the plea agreement, Hargobin Mortley, a cooperating government witness who provided security for Carroll's visa fraud scheme, would not have had to testify against Carroll at his sentencing hearing and thereby incur the risks associated with implicating other corrupt Guyanese police officials. While this development may have resulted in a frustrating increase in the prosecution's workload, it is no justification for an upward departure in Carroll's offense level.

## CONCLUSION

For the preceding reasons, we REVERSE the district court's order calculating Carroll's final offense level to be 39, VACATE Carroll's sentence, and REMAND the case for sentencing in a manner consistent with the following offense-level calculations:

| | | |
|---|---|---|
| **Base Offense Level (Bribery)** | 10 | (2C1.1(a)) |
| **Specific Offense Characteristics** | | |
| Involved multiple bribes | 2 | (2C1.1(b)(1)) |
| \$5 million < loss amount | | |
| < \$10 million | 14 | (2C1.1(b)(2)(A) & 2F1.1) |
| **Adjustments for** | | |
| Organizer/Leader Role | 4 | (3.B1.1(a)) |
| Obstruction of Justice | 0 | (3C1.1) |
| Acceptance of Responsibility | -3 | (3E1.1(a)) |
| **Downward Departures** | | |
| Substantial Assistance | 0 | |
| **Upward Departures** | | |
| Loss of Public Confidence in Government | 0 | |
| Significant Disruption of Govt. Function | 0 | |
| Danger to the Public Welfare | 0 | |
| Use of Threats of Violence | | |
| & Resulting Property Damage | 0 | |

**<u>TOTAL OFFENSE LEVEL</u>**                    <u>**27**</u>

No. 02-2633 15

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*